# THE SUPREME COURT

OF

## PENNSYLVANIA.

WESTERN DISTRICT—PITTSBURGH, 1883.

|104  117|
|108  454|

## Coyle *versus* The Commonwealth.

1. The lawful authority of a judge in the exercise of his public judicial functions cannot be questioned by any private party. The attorney-general, representing the state, alone can question, by a writ of quo warranto, the constitutional right of a judge to exercise his judicial functions.

2. A prisoner, indicted for murder, cannot, by a special plea to the jurisdiction of the court, impeach the constitutionality of an Act of Assembly, which designated the county in which said court was held as a separate judicial district, upon the allegation that said county contained less than the number of inhabitants requisite under article V. section 5, of the Constitution, to entitle it to be constituted into a separate judicial district.

3. The proper function of witnesses called to testify as "experts," is to instruct the court and jury, in matters so far removed from the ordinary pursuits of life, that accurate knowledge of them can only be gained by study and experience, so as to enable the court and jury to judge intelligently of the force and application of the several facts introduced in evidence.

4. Where, in a proper case for expert testimony, the facts are admitted, or proved by evidence which is not conflicting, the opinion of an expert upon such facts is admissible as a scientific deduction.

5. Where, however, the evidence is conflicting, an expert cannot be asked his opinion as drawn from the whole evidence; the questions to him should state specifically particular facts in evidence, hypothetically assuming them to be true, upon which he is to express his opinion; he should be asked, by independent questions, his opinion upon facts testified to on the one hand, and his opinion upon opposing facts testified to

[117]

on the other hand, in such manner that the jury can know upon what particular assumed state of facts his several opinions were based.

6. The examination of medical experts in this case, upon facts testified to under the defence of insanity, held to have been not improperly conducted.

October 1st 1883.   Before MERCUR, C. J., GORDON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.   PAXSON, J., absent.

ERROR to the Court of Oyer and Terminer and General Jail Delivery of *Adams county :* Of May Term 1884, No. 1. Certified from the Middle District to the Western District of this court.

Indictment of John Coyle, Jr., for murder in the first degree of Emily Myers. The indictment was found, and the case was originally tried in the Oyer and Terminer of York county, when there was a verdict of guilty, as indicted, and sentence was pronounced. Upon a writ of error to this court the judgment was reversed and a venire facias de novo awarded (reported 4 Out. 573).

After the return of the record, the court of Oyer and Terminer of York county granted an application on behalf of the prisoner to change the venue to Adams county, and the record was accordingly certified to the Oyer and Terminer of that county, and the prisoner transferred to the Adams county jail.'

The York county record showed that when the prisoner was originally arraigned, and the indictment read to him, and being asked if he was guilty of the felony whereof he stood indicted, he replied, "I don't know anything about it," whereupon the court ordered a plea of "not guilty" to be entered.

When the case was called for trial in Adams county, and before the jury was sworn, the prisoner's counsel moved the court to withdraw the plea of "not guilty," so as to enable the prisoner to plead specially, first in order, the following special plea to the jurisdiction of the court, viz :

"The said defendant in his own proper person comes and says that this court ought not to have or take further cognizance of the above indictment against him because he says that so much of the Act of Assembly entitled "An Act designating the judicial districts of the Commonwealth and providing for the appointment and election of judges therein ; for issuing to additional judges learned in the law commissions as President Judges, and manner of fixing terms of courts therein," approved April 9th 1874 (P. L. page 55), as numbers and designates the county of Adams as the Forty-second Judicial District of the said Commonwealth, is unconstitutional and void ; that the said county of Adams contained at the date of said Act of Assembly and still contains less than forty thousand inhabi-

[Coyle *v.* Commonwealth.]

tants; that by the 5th section of article V. of the constitution of the said Commonwealth, no county of said Commonwealth can constitute a separate judicial district and elect a judge learned in the law until it shall contain forty thousand inhabitants : And this the said defendant is ready to verify. Wherefore he prays judgment whether this court can or will take further cognizance of said indictment, etc."

The court overruled the motion to withdraw the plea of "not guilty." The Commonwealth demurred to the special plea as insufficient in law, whereupon the court gave judgment in favor of the Commonwealth, on the demurrer. (First and second assignments of error.)

Upon the trial, the fact of the killing was not denied, but the prisoner's counsel relied upon the defence of insanity. The evidence of the following facts was uncontradicted :

The prisoner was a young man of twenty-six years of age, living with his father and mother, on the banks of the Susquehanna river, nearly opposite Marietta in Lancaster county, and an only child. Emily Myers, the deceased, was a hired girl, employed as a domestic by his mother, and living with the family. On the morning of the 30th of May 1881, at about 5 o'clock, his mother called Emily, who slept in the room with her, to get up and go and milk the cows. Emily got up, dressed herself, and went to the barn to milk. Shortly afterward the mother heard three sounds, like striking with an axe on a board. She got up and dressed, and went down stairs and out to the end of the porch nearest the barn, and called Emma. No answer came, and presently John Coyle, Jr., appeared at the front door at the porch, and said to his mother, that she needn't call Emma, that she was dead, that he had shot her, and shot himself. Mrs. Coyle then called her husband and told him what John said he had done.

Mrs. Coyle (a witness called by the Commonwealth) testified further :

" I asked him why he had done so, and he said that Emma had promised to marry him three times, and went back on him, and that she had ruined him and set him crazy, and that he went to the stable to see whether she was as good as her word that morning, and asked her again, and she told him ' No ' and that she would not marry him or anybody else, and then he said ' I will shoot you,' and she said ' shoot me quick right in here,' (witness indicating her breast,) and throwed herself back, and then he shot her, and shot himself, and wished to me there to die beside her.". . . " He was very frightful looking ; his eyes were very large, and he as pale as death and all bloody, and everything wild—he had the general appearance of a madman more than anything else."

[Coyle *v.* Commonwealth.]

The body of the deceased was found in the stable, and a pistol was lying near by. The prisoner had shot himself twice, apparently with the same pistol. Both wounds were superficial, one on the occipital bone just back of his right ear, and the other on the sternum. In reply to a remark by a neighbor, soon after the shooting, "Johnny, you have made bad work," he said " he was sorry he hadn't finished the job."

The evidence on behalf of the Commonwealth was not printed. It was claimed by the Commonwealth that the killing was in pursuance of a pre-conceived, deliberately formed and previously declared intent on the part of the prisoner. A portion of the testimony in the Commonwealth's case is thus recited in the charge of the court :

"Now, gentlemen, I recollect of four witnesses who spoke of some purpose in John Coyle, Jr., to kill Emily Myers, before the 30th of May 1881—John F. Sultzbach, John L. Burg, John B. Thompson and John Warfield. John F. Sultzbach. testified to you : 'I live in Marietta ; I know John Coyle, Jr.' I saw him the latter part of April or beginning of May 1881; Jerry Hipple had a conversation with him; John made a remark what he thought of that little pullet; he said the girl would not have connection with him, and he would have'— without my quoting the vulgar language of the witness, as you will recollect that yourselves—'he would have or kill her; the latter part of April or beginning of May 1881 ; it was in the spring.' He said afterwards, 'the last of March or beginning of April of 1881'—he changed it." . . . . " If I recollect properly, the only time in which the prisoner in this case burst out with any expression was while this witness, John F. Sultzbach, was testifying. I suppose you heard it. The prisoner said, 'I will swear on the Bible that that is not true.' And, gentlemen, it is very important for you to determine whether this testimony of John F. Sultzbach is true or not. You observe that he imputes to the defendant this terrible purpose of having sexual intercourse, or, if not, that he would kill her. That was the whole conversation."

There was much evidence given on behalf of the prisoner with the view of showing that he was insane, at and before the killing. Among other things, it was testified to that as far back as 1871, when a boy of sixteen, he was injured in the hand by the accidental discharge of a gun, close to his head, and " his face was blackened with powder and blood." That in the following year he was prostrated by a very severe attack of typhoid fever, and ever since then suffered at intervals from pain in the back of his head. That he was in the habit of secluding himself at times, wandering alone in the woods, and refusing to take food; that he was addicted to " secret vice,"

[Coyle v. Commonwealth.]

and occasionally to strong drink ; was annoyingly garrulous on the subject of matrimony, abruptly asking women to marry him; that he played marbles with boys in the streets, and would often beg a dime to get a drink; never was able to attend to any business except rowing a ferry, and was often called by the nick-name "Crazy Johnny Coyle ;" that on the Saturday before the killing he was in a depressed mental condition, and locked himself in his room, would not come out to get his meals, and was not again seen until Monday morning, a few minutes after he had shot and killed the girl.

The additional testimony in the case, so far as material, is set forth at length in the assignments of error, infra.

Verdict, guilty of murder in the first degree, in manner and form as indicted.

A motion in arrest of judgment and for a new trial was overruled by the court, and sentence of death was pronounced.

Thereupon the prisoner took this writ of error, and filed ten assignments of error, the first two being to the action of the court in refusing the prisoner's motion to withdraw the plea of not guilty, and entering judgment for the Commonwealth on the demurrer to the prisoner's special plea, as hereinbefore set forth. The third and fourth assignments were to the action of the court in permitting the Commonwealth's counsel to recall John Coyle, Sr., for further cross-examination, and for the purpose of contradiction after the opening of the rebutting evidence, to show his knowledge of the capacity of the prisoner to write and keep accounts ; and to prove by another witness a conversation with John Coyle, Sr., also for the purpose of showing the latter's knowledge of such capacity on the part of the prisoner, and in contradiction of his prior testimony.

The remaining assignments of error are given in full, as follows :

V. The court erred in admitting the Commonwealth's offer to prove by John Warfield that in the fall of 1875, he met John Coyle, the defendant, on the hillside close to a gatepost, and that the witness told him that he should go home, that the old man was uneasy about him, and it would be all right now. The purpose of this offer (as stated) being to explain his presence in the woods and his absence from home at that time, which offer was objected to by prisoner's counsel as not rebutting and not proper evidence for any purpose.

VI. The court erred in admitting the Commonwealth's offer to prove in *rebuttal* by Jerry H. Altland to *corroborate* his brother Philip A. Altland, that a conversation did occur between the prisoner and his parents in his cell, in the presence of Philip A. Altland to which the latter had testified in chief, in which the prisoner had stated that he had shot the

deceased, because she refused to marry him, which was objected to by prisoner's counsel because it should have been offered in chief and not in rebuttal. Philip A. Altland having testified *in chief* for the Commonwealth that such a conversation had taken place, which was contradicted by both John Coyle, Sr., and Mrs. Coyle, when this witness J. H. Altland was offered and admitted to *corroborate* his brother and contradict John Coyle, Sr.

VII. The court erred in allowing the Commonwealth's counsel to ask Dr. I. C. Gable the following question and in admitting his answer thereto as rebutting evidence.

*Question.* Whether or not shock or concussion of the brain would be occasioned by the discharge of a gun in the hands of a person, the discharge shattering the hand, and leaving no other marks on the face and head other than powder that could be washed off?

Objected to, that no sufficient foundation has been laid for the opinion, and because the true theory of the defense is not properly stated in the question, nor the facts as proved in the case.

*The Court.* The objection is overruled as the counsel for the prisoner in opening the case to the jury referred to concussion of the brain from the discharge of a gun as one of the original causes of the mental disturbance of the prisoner.

*Answer* of the witness. In my judgment it would not.

VIII. The court erred in allowing the Commonwealth's counsel to put hypothetical questions based upon *small, isolated and fragmentary portions* of the ·*whole* evidence in the case bearing upon the question of the prisoner's insanity at the time of the homicide, and especially in this, from page 556 to 560 inclusive of the testimony of Dr. M. J. McKinnon in rebuttal to which prisoner's counsel took a bill of exception, the full substance of which is here quoted :

*Question* by Mr. Swope (would) talking about marrying different persons—well proposing marriage to Mrs. Wein, when she was Miss Imsweiler, in a way that impressed her that he was joking, and in fun about it? (Objection.) That is the evidence. Also, to Mrs. Mack's daughter in the same spirit of levity, and on another occasion to Miss Rollin and to the father of Miss Blessing, a girl of about 9 or 10 years of age—show insanity?

The witness. Not necessarily.

Q. State, doctor, whether or not the defendant's being seen on one or two occasions on the street—in the alley once and in the square—or if upon more than one or two occasions, the defendant was seen in Marietta playing marbles with boys, even a colored boy or two being with them, the defendant

[Coyle v. Commonwealth.]

being a ferryman, accustomed to taking parties from the home shore to Marietta, and sometimes remaining in Marietta, until the party he had brought over was ready to go back, would that show insanity ?   A. No, sir.

Q. State whether or not, six or eight years ago, the defendant, while talking to Mr. Hanlen in Marietta—Mr. Hanlen first speaking about his father's place as a good summer resort, and the defendant offering to sell the same to him, he speaking or referring to the fact that his parents were getting old, and that it would soon be his—whether that would be evidence showing insanity ?

Objected to as not a full statement of the facts.

Q. (By the Court.)  Did you hear Mr. Hanlen's testimony on the subject ?   A. I heard Mr. Hanlen's testimony on the subject.

Q. Well, if you recollect ?   A. His account of it—his statement—I think I did.

Q. (By Mr. Swope.)  From your recollection of that statement, state whether or not, in your opinion, it would show insanity ?   A. I don't think so ; no, sir.

Q. Suppose the defendant had stolen a boat from one Dr. Alexander, and the Doctor had threatened to punish him for it, and the defendant, being accustomed to the use of strong drink, had entered the house of Mrs. Hanlen and said that Doctor Alexander was going to kill him,—walked up and down the room,—Mrs. Hanlen saying, "no, he won't hurt you," and the defendant replying, " yes, he will, and he is a doctor, and he can strike where it will kill,"—would that show insanity ?   A. No, sir.

Q. Suppose six or seven years ago Mrs. Hanlen and a few friends went over to Coyle's ferry, defendant's home, to spend the day in the saw-mill of Mr. Coyle, and that while they were there John came with a horse, and offered to give her a ride, leading the horse, and the horse having no bridle on it, which she refused, and her friends, two ladies, of the age, I think it was, sixteen and eighteen—(By the court)—twenty and twenty-one—(By Mr. Swope)—Yes, of the age of twenty and twenty-one, accepted the offer, got on the horse and took a ride, the horse being led by John, and they returned by him safely,—would that show insanity ?   A. No, sir.

Q. If the defendant was, in 1875, employed as a hand by a contractor in clearing wood—hauling wood away—and John lost a load each morning by reason of neglect and inattention to business, and was therefore discharged, or scolded by the contractor and refused to return to work,—show insanity ?   A. No, sir.

Q. If, during the ten years from 1871 to 1881 he was

[Coyle *v.* Commonwealth.]

scolded by his father in the bar for not returning sooner from Marietta than he did, and he called his father an old son-of-a-bitch—does that show insanity? A. No, sir.

Q. Suppose during the period of ten years, the defendant attended to his usual avocations,—was a safe ferryman across the river, and the home ferry to Marietta; attended to the duties about the house, such as sawing wood, white-washing, worked in the fields,—the tobacco, the corn, and the potatoes, buying from the neighbors, for his father, corn, feed, straw, &c., going to the mill and acting there for his father, making purchases at stores for his father,—and attended to his usual duties during all this time, and that in 1881 he became enamored with a maid living at their house—wanted to marry her,—she agreed to do it, but "went back on him" twice, and he having declared that she had gone "back on him" twice, and that he was going to ask her again, and that if she didn't marry him "By God, I will shoot her:" and shortly after, on the morning of the 30th of May, 1881, the maid, about five o'clock in the morning, went to the stable to milk the cows, the defendant followed and in the stable asked her whether she would marry him, and she answered she would not marry him, nor no one else, and the defendant says "If you don't, I will shoot you! And she said, "Shoot me quick, shoot me here." And the defendant did shoot and kill her, and afterwards, shot himself, went to his room, and when asked by different persons why he had done it, repeated the fact that he did it because she had promised to marry him twice, and had gone back on him, and that he went out and asked her, and if she refused him he would shoot her, and she said, "Shoot me right here," and that he did shoot her; and that when he was taken away by the officers from Coyle's to the York jail, requested the father to go along, I believe, to prevent persons from hurting him now, because he wanted time to repent,—would this circumstance show insanity?

Objected to that facts as proved in the case are not fairly put in the question, particularly in reference to the time that elapsed, according to the proof, between the time he shot the girl and the time he shot himself.

The Court. That is, as to the facts not being fully stated in any other particular?

Mr. Fisher. Yes, sir, we want it to be one. Prisoner's counsel here takes the general objection to the last and all the foregoing hypothetical questions as being put separately, no one of them fairly showing all the evidence given in the case on the subject of the prisoner's mental unsoundness.

The Court. Just so that it is not misunderstood,—I under-

[Coyle *v*. Commonwealth.]

stand it to be that the questions put separately do not present the whole case as offered by the defense?

Mr. Fisher. No, sir, not so offered by the defence,—as proved in the case. A great part has been proved by the Commonwealth.

The Court. That is so. I understand you that the questions as put separately do not properly represent the facts in this case?

Mr. Fisher. No sir, we took exception to them seriatim as we went along. I now want the benefit of this general objection to the manner in which this hypothetical case has been mixed up and put to the witness. You might as well ask the witness whether if a man would not eat his breakfast in a single instance, it was evidence of insanity.

Objection.

Mr. Swope. These, as testified, are all isolated.

The Court. I think you are entitled to an answer, Mr. Swope.

Q. (By Mr. Swope.) I need not repeat that long question? A. This train of circumstances would not lead me to believe that he was insane at the time,—that he was unsound.

Q. Then I understand you to say that it would not show insanity? A. No, sir.

IX. The Court erred in allowing the Commonwealth's counsel to ask Dr. J. W. C. O'Neal the following question in rebuttal, and in admitting his answers thereto, viz:

Q. (By Mr. Swope.) State whether or not in your practice you are consulted by persons for the loss of manhood, and on account of the secret habit—this private vice,—if so, please indicate how frequently, as nearly as you can, and tell the jury, if you please, the way patients approach physicians when they speak about a complaint of such a character as that?

Objected to and purpose asked for.

Commonwealth's counsel states:

The purpose is to explain the appearance of the defendant as testified to by Dr. Norris, when he came to him and acquainted him with the affliction that he was under.

Objected to that the facts proposed in the question are irrelevant and not rebutting.

The Court. I think the purpose is competent. Objection overruled. Exception noted for the defendant.

The witness. I am consulted often, and I think I may say through the whole period of my service in the practice of medicine; that is the first part of it. Now if you give me the second part?

Q. (By Mr. Swope.) Explain to the jury when persons approach you to be treated—confess to such an affliction as that

—in what way they act, I mean in reference to the subject—I don't want to lead you—whether they regret? A. Well, they come characteristically. When I say "come characteristically" I mean approach the subject with a good deal of regret,—seem troubled—their countenance indicates largely their situation—they are backward—they approach the subject by degrees—they have expression of unhappiness, based upon the fact of their having lost their manhood.

X. The court erred in allowing the Commonwealth to ask Dr. J. W. C. O'Neal as an expert, the following questions and in admitting his answers thereto, to which the defendant's counsel excepted and a bill of exceptions was noted, the full substance of which is here quoted.

Q. You heard the various questions asked this morning, proposed to Dr. McKinnon by myself about the actions of the defendant during the period of ten years, isolated acts, and also the questions asked by Mr. Fisher, did you not? A. I did.

Q. Now, I would ask you, in your opinion as a medical expert, whether those acts of the defendant, occurring within that period of ten years, and isolated from each other—what condition of mind, if any, they would show? A. I cannot answer that question as a whole. If you will divide that up for me, I will say yes or no, as you ask, to matter that influences my judgment or enables me to indicate.

Q. Suppose the defendant, during ten years previous to 1881, refused to eat at different times—complaining of the eatables that were on the table, and would leave the table—would that show insanity?

(Objected to. Purpose asked for.)

Mr. Swope. The purpose is to show——

Mr. Fisher. That that would not be an evidence of insanity?

Mr. Swope. Yes, sir.

Objected to as not proper evidence in rebuttal, and not a fair statement of the case as proved on this trial.

Q. (By Mr. Swope.) If the defendant during the ten years previous to 1881, at certain times isolated from each other refused to eat, and complained of what was on the table, and left the table—if the doctor has heard all the questions—— A. Do you want me to answer that question as you put it there?

Mr. Fisher. Just wait.

(Argument.)

The witness. I would like to answer your question altogether, but really, gentlemen, I cannot. If you will separate them, I think I can answer them; I am doing this swearing, if you please.

[Coyle *v.* Commonwealth.]

The Court.  Very well, we will allow the question.

Exception noted for the defendant.

Q. (By Mr. Swope.)  What is your answer?  A. What is the question you put to me.

Q. Suppose the defendant at different times during the ten years previous to 1881, refused to eat at the table, complaining of the vegetables or food on the table, and leaving the table—would that show insanity?  A. Isolated, no.

Q. Suppose during a period of ten years previous to 1881, the defendant would be asked on certain isolated occasions to do work by his parents, and that he would in an ugly and bantering way curse and swear at them—would that show insanity? A. No, sir.

Mr. Fisher.  We do not desire to take up the time of the court in asking for a ruling on questions separately.

The Court.  No, sir; let it appear at the outset that the Commonwealth proposes to ask these questions separate in this way.  The prisoner objects, the objection is overruled and an exception noted for defendant.

Mr. Fisher.  And that will cover it all.

The Court.  Yes, sir.

Q. (By Mr. Swope.)  Suppose during a period of ten years anterior to 1881, on isolated occasions, the defendant spoke about the fact that he was going to kill himself—that once he went to the barn, sat down in the granary, was followed by his mother and uncle, and was seen by them in the granary with the pistol in his hands pointed at his breast and his eyes raised up, and was prevented from shooting by reason of his uncle holloaing at him; suppose again, isolated from the other, he was carrying a razor, and said he was going to cut his throat, but didn't; and that on another occasion, isolated from the others his mother was preparing poison for the purpose of poisoning rats, that he came in and said he wanted some, and that he reached over for it, and was prevented from getting it by a young lady intervening or standing by him, and he didn't get it—would these facts show insanity?  A. Not necessarily.

Q. If, during a period of ten years anterior to 1881, the defendant at different isolated times talked about marrying certain ladies—would propose marriage at one time to a Miss Emswiler, at another time to a Miss Mack in a joking, jocular way, and at other times to other persons—isolated acts—once to a young lady herself, and at another time to the father of a girl of between nine and ten years of age, upon whom the defendant said he was willing to wait,—the defendant being a dissolute drunken man,—would that show insanity?  A. No, sir.

Q. Suppose the defendant during a period of ten years anterior to 1881, he being a ferryman and rowing people reg-

[Coyle *v.* Commonwealth.]

ularly from the home shore to Marietta, and accustomed to remain in Marietta for the return of passengers who intended to return from Marietta in a short while, and the defendant being seen on different isolated occasions playing marbles with boys, —would that show insanity?

Objected to the term "show" instead of whether it is a "symptom of insanity."

Q. (By Mr. Swope.) Suppose the defendant once, isolated and alone, during the ten years anterior to 1881, at the suggustion of a Mr. Hanlen, who spoke of his father's place across the river as a good summer resort, it being used for that purpose during the summer by little parties, and the defendant claimed that his parents were getting old, and that he was the only child, and that soon it would be his and proposing to sell or offering to sell the same to Mr. Hanlen for $1,500,—show insanity? A. No sir.

Q. Suppose the defendant once, isolated and alone from the rest of these facts, had stolen a boat from one Dr. Alexander and that the doctor had threatened to punish him for it, and he was accustomed to the use of strong drink and had told Mrs. Hanlen that the doctor was going to kill him—came into the house—walked up and down the room, and she told him the doctor wouldn't, but he said "Yes, he is a doctor, and he will know how to strike to kill,"—would that show insanity? A. No, sir.

Q. Suppose if once, isolated and alone from the other facts stated, during ten years anterior to 1881, Mrs. Hanlen and certain friends went over to Coyle's ferry for the purpose of spending the day, and remained in the saw-mill of the defendant's father,—that while they were there John came with a horse without a bridle and without a saddle, and offered to give Mrs. Hanlen a ride, which she refused, and her friends, two young ladies 20 and 21 years of age, accepted the offer, and got on the horse bare-back and took a ride, the horse being led by John, and they returned safely,—would that show insanity? A. No, sir.

Q. Suppose the defendant in 1874, isolated from these other facts, was employed as a hand by a contractor in hauling wood and clearing it away, and John lost a load each morning by reason of neglect and inattention to his business, and was therefore discharged by his employer—was scolded by his employer and refused to return to work—show insanity? A. No, sir.

Q. Suppose that during a period of ten years anterior to 1881, he was scolded by his father once at the bar for not returning sooner from Marietta than he did, and he called his father "an old son-of-a-bitch,"—would that show insanity? A. No, sir, mighty bad rearing.

[Coyle v. Commonwealth.]

Q. If a person were working out and boarding with the father of the defendant, and John had known it where the person did not leave until the evening for his home, offered a string of bony mullets for sale, and asked two dollars for them, and in the evening when the person was going home, the defendant brought up the fish and gave them to him for nothing —would that show insanity? A. No, sir.

Q. Suppose a party of young men once, isolated from the rest of these facts, and during the period of ten years from 1871, camped for a period of ten days at old Mr. Coyle's— camped in the saw-mill of Mr. Coyle—they had a picnic during the time they were there, inviting young ladies from the neighborhood to come and spend the day, and that one member of that camp took a walk with a young lady up in the hills, and afterwards the defendant, being acquainted with the party that had taken the walk, and the rest of the gentlemen who were there—there being about three in the camp—the prisoner had said—if the defendant had said to the party who took the walk, asked about sexual intercourse up in the woods. A. That would show moral depravity, but not insanity.

Mr. Fisher. Please refrain from comments.

Q. (By Mr. Swope.) Do I understand you to say it would not? A. I say no.

Q. Suppose John told a friend, a social visitor to their family a gentleman—and John having no brother, and being acquainted with the person—the fact that he was guilty of the bad habit of masturbation and wanted to get married, and would not be fit on account of this habit—show insanity? A. No, sir.

Q. Would retreat to his room a few times say, disjointed and unconnected with those other things, leaving his work and going to the woods at times—being seen once within ten years sitting himself with his head drooped, and talking to himself, he having had frequent quarrels with his father and driven from home, and accustomed to drink to excess—show insanity? A. That question categorically won't convey to the court and jury a proper meaning.

The Court. Answer it to suit yourself.

Q. (By Mr. Swope.) What were you going to say? A. Well, that shows moral depravity, a giving way of morals—I answer under instructions of the court—I——

Q. You say it would not show insanity?

Mr. Fisher. He has not said that yet.

The witness. I answered it, Mr. Swope, that it showed moral depravity and bad education—bad control of one's self.

Q. (By Mr. Swope.) Suppose the defendant being a drink-

ing man, and addicted to debauches, remained out all night drinking at different times during the last ten years, and complained of a pain in his head—would that show insanity? A. That shows that he had been on sprees, and had been irregular in his habits.

Q. Well, would it show insanity? A. No.

Q. Suppose during the last five years the defendant, isolated from these other facts, while walking in the country with two or three of his acquaintances, and had stopped to urinate, and after getting through urinating, had shook his person at one of the party and asked whether they could beat that, would that show insanity? A. No, sir.

*H. L. Fisher* and *W. C. Chapman*, for the plaintiff in error.

*S. M. Swope*, district-attorney for Adams county, and *Edward D. Ziegler*, district-attorney for York county, for the Commonwealth, defendant in error.

Mr. Justice CLARK delivered the opinion of the court, January 7th 1884.

The question sought to be raised by the prisoner's special plea to the jurisdiction, is not properly before us. The rightful authority of a judge, in the full exercise of his public judicial functions, cannot be questioned by any merely private suitor; nor by any other, excepting in the form especially provided by law. A judge de facto assumes the exercise of a part of the prerogative of sovereignty, and the legality of that assumption is open to the attack of the sovereign power alone. If the question may be raised by one private suitor it may be raised by all, and the administration of justice would under such circumstances prove a failure. It is not denied that Judge McLEAN was a judge de facto, and if so he is a judge de jure as to all parties, except the Commonwealth. The attorney-general representing the sovereignty of the state, by a writ of quo warranto, might properly present this constitutional question for our consideration, but it cannot come before us from any other source, or in any other form. This is not a new question; it came before this court in Burrell's Case, 7 Barr 34; and in the case of Clark *v.* Commonwealth, 5 Casey 128. The same principle is distinctly asserted in Campbell *v.* Commonwealth, 15 Norris 344; and has been repeatedly applied in many others. This point was not pressed in the oral argument of counsel, but as it was the subject of the second assignment of error, we have been obliged to dispose of it. As the plea to the jurisdiction could not in any event have

availed the prisoner, even to raise the question intended, it is not only unnecessary to discuss the grave constitutional question suggested, but the first assignment of error falling with the second, we need make no further reference to either.

The third and fourth assignments of error are without merit. It was proper for the court, in the exercise of its discretion to allow the witness, John Coyle, Sr., to be recalled for further cross-examination, the offer was in part at least to lay ground for contradiction, and the testimony of Imsweiler was afterwards properly received for that purpose.

Nor can we find any merit in the fifth or sixth assignments. The testimony on the part of the defence, as to the prisoner's habit of resorting to the woods, and remaining there in an apparently melancholy state was general, not specific, and the Commonwealth was therefore at liberty, by the introduction of specific facts, to explain the causes which on some occasions led to this result. If the proof on part of the prisoner had been of specific instances, the course of examination insisted upon by the prisoner's counsel, might, perhaps, have been the proper one. The testimony of Philip A. Altland was stricken out of the case by the court, and the jury was instructed to disregard it; but if it had not been stricken out it was certainly competent by the testimony of Jerry Altland, to contradict John Coyle, Sr., and his wife, who testified for the prisoner, in their statement that they were not present at the alleged interview in the jail.

The counsel for the prisoner having, in their opening address to the jury, referred to concussion of the brain from the discharge of a gun, as one of the original causes of the mental disturbances of the prisoner, and introduced evidence tending to show that, from that time, his conduct was such as to indicate unsoundness of mind, it was we think, proper to inquire of competent witnesses, whether the cause thus assigned, and attempted to be shown, was sufficient to produce the alleged result. The 7th assignment is therefore not sustained.

This brings us to the substantial and important question in the cause, as raised by the 8th and 10th assignments of error.

In the examination of experts it is only necessary to keep constantly in view, that their proper office is to instruct the court and jury in matters so far removed from the ordinary pursuits of life, that accurate knowledge of them can only be acquired by continued study and experience; the purpose is to enable both court and jury to judge intelligently of the force and application of the facts introduced in evidence, as they would have been able to do if they had been persons properly instructed upon the subjects involved. Expert testimony, owing perhaps to the greater extent of recent scientific research,

is much more frequently resorted to than formerly, and the rules regulating its introduction may be considered established ; there seems to be no great conflict of authorities on the law applicable thereto.

In cases revolving the question of insanity a medical expert may of course give his opinion based upon personal examination and knowledge of the patient; but where he is not possessed of a personal knowledge, his opinion must as we have said in Rouch *v.* Zehring, 9 P. F. Smith 74 " be predicated of the facts proved or admitted, or of such as appear in evidence hypothetically stated," and this must be accepted with some modification.

The credibility of the witnesses is in all cases a question for the jury ; what is " proved " is for their determination. An expert cannot, therefore, if the witnesses are contradictory, be interrogated as to the effect, produced upon his mind, by all the evidence in the cause ; and, upon similar grounds, where the testimony, although not contradictory, is inconsistent or otherwise conflicting, an expert is not allowed to express an opinion upon the effect of it, even assuming the truth of the whole, as the question of the preponderance of the testimony is also for the jury ; where the truth of the evidence, in such a case, is assumed, or admitted, before the question upon matters of science can arise, the witness must determine a question of fact, which is not a matter of science, and, it is impossible for the jury to determine of what conclusion of fact the opinion of the witness is predicated.

Where the facts are not conflicting however, and are either admitted or proved, the opinion of an expert, being a conclusion drawn from facts that are known, is admissible as a scientific deduction, according to the skill, experience and knowledge of the witness.

The mode of examination which is generally pursued, however, is to interrogate the witness in hypothetical form as to what state of mind is indicated by certain facts assumed, as testified by certain of the witnesses, or by all of them where they are not in conflict. Thus, by means of the hypothesis the jury is enabled to determine by the mere form of the question, what specific facts are assumed by the expert in his conclusions, and of what his opinions are predicated ; and these opinions will be regarded by the jurors in their deliberation, just as they may find the facts assumed in each interrogatory to be true or not. Even hypothetical questions, however, may perhaps be framed in such form as, practically, to call upon the witness to pass upon the merits of the case, and if so framed, they are as objectionable as if they directly interrogated the witness upon the whole case presented. The examination must, of course,

[Coyle v. Commonwealth.]

be confined to the laws and conditions of the specialty in which the expert is skilled, and the hypothesis must be consistent with what appears, or what may be fairly claimed to appear in the proof; the interrogatories may be propounded from the whole of the evidence if not conflicting, or any part of it; but when facts on one side are in conflict with facts on the other, they ought not, as stated by ALDIS, J., in the case of Fairchild *v.* Bascomb, 35 Vt. 406, to be incorporated in one question, " but the attention of the witness should be called to their opposing tendencies, and if his skill or knowledge can furnish the explanation which harmonizes them, he is at liberty to state it."

Mr. Redfield, in his treatise on the Law of Wills, page 150, says : " The most convenient mode of putting the inquiry, and the least exceptionable one in our judgment, is to inquire what state of mind is indicated by certain facts assumed or testified by certain witnesses, or in any other hypothetical form of bringing the point of inquiry to the mind of the witness. If the witness says the facts assumed indicate mental unsoundness, he may be inquired of in regard to the state and degree of mental unsoundness thus indicated, and how far it will disqualify the person for business, or render him unconscious of the nature of his conduct."

At the trial of this case, in the court below, the interrogatories to the expert witnesses were put in hypothetical form ; they were so propounded that the jury could without difficulty discover the particular facts upon which the several opinions were given ; whether they were meagerly stated for the opinion of the witnesses thereon was a subject for discussion to the jury. Each side had the right to an opinion from the witness upon any hypothesis reasonably consistent with the evidence, and if meagerly presented in the examination on one side, it may be fully presented on the other ; the whole examination being within the control of the court, whose duty it is to see that it is fairly and reasonably conducted.

The questions were perhaps leading in form, but they were not objected to on that ground, nor would this defect in form appear to have produced any mischievous results, if we may judge of this from the results of the cross-examinations.

It is true, perhaps, that what is merely indicated by certain facts may not be shown by them. Although the words " show " and " indicate " are sometimes interchangeable in popular use, they are not always so. The present ordinary use of the words, discloses a difference in signification and that difference is perhaps more recognizable, when these terms are applied to the law, or to medical science. " To show " is to make apparent or clear by evidence, to prove, whilst an " indication " may be

merely a symptom, that which points to, or gives direction to the mind. The Commonwealth, however, had a right, we think, to inquire in proper form, of a cómpetent expert, whether any condition of facts, assumed, either proved or indicated insanity; whether such facts were conclusive, or merely symptomatic, or neither. Although the Commonwealth's counsel in the several examinations used the word show, the distinction was in each instance fully brought out in the cross-examination.

The 9th assignment of error is to the admission of a portion of the evidence of Dr. J. W. C. O'Neal. It would appear that the prisoner had for a number of years practiced the secret vice of self-abuse, and, on Monday previous to the homicide had applied to Dr. H. E. Norris for treatment, in an affliction resulting from that vice, which Doctor Norris termed "the loss of manhood." Dr. Norris, who was called by the prisoner in his examination, and cross-examination, particularly described the conduct, manner and appearance of the prisoner at the time he applied for treatment. In response to a variety of questions he says:

"Of course I could not see into his mind, into the intricacies, but what I saw of him that Monday morning; when his condition was called to my attention, he had the appearance of an abject man, almost on the verge of despair."

Q. "When was that?"

A. "On Monday previous to the commission of this act and I there—well, I took particular notice, and contrasted his appearance then, to all other times,—and I had met him occasionally, as he had been, to the best of my knowledge, under drink—he generally met me, 'how are you, doctor?' 'About as middling' and 'give me ten,—I want to get a drink.' He seemed sad, and with his head down, but at the other times he seemed to be in better spirits."

Q. "Do I understand that to be John Coyle's condition on the Monday morning previous to the act?"

A. "He presented then to be a man—an abject despairing man."

Q. "Abject and despairing with his head bowed, and what else?"

A. "Soliciting help from me and if not helped would kill himself."

Q. (By Mr. Swope.) "When patients come to consult with you—that is, remembering the patient that you spoke of—on occasions as delicate as that, is it not a subject approached with a great deal of reluctance and regret?"

A. "Generally so."

Q. "Is it not the custom of every man, always, to approach that subject with sorrow and regret?"

[Coyle *v.* Commonwealth.]

A. " Sometimes; it is not universal, it is not general.  I cannot say that there are no exceptions to that general rule, there may be some, I have had sometimes, but they do not present this invariably, sir,—I cannot say that."

Dr. O'Neal was called as an expert on the part of the Commonwealth, and was inquired of in rebuttal as follows :

2. " State whether or not in your practice you are consulted by persons for the loss of manhood, and on account of the secret habit,—this private vice—if so, please indicate how frequently as nearly as you can—and tell the jury, if you please, the way patients approach physicians when they speak about a complaint of such a character as that ?"

The purpose of this offer as stated, was to explain the appearance of the defendant as testified to, by Dr. Norris.

A. " I am consulted often, and I think I may say through the whole period of my service, in the practice of medicine, that is, the first part of it,"—" they come characteristically. When I say ' come characteristically,' I mean approach the subject with a good deal of regret—seem troubled—their countenance indicates largely their situation—they are backward, they approach the subject by degrees—they have expression of unhappiness based upon the fact of their having lost their manhood."

We cannot agree with the learned counsel for the prisoner that the admission of this testimony was error.  If the vice of self-abuse has such a peculiarly depressing effect upon the mind, which becomes apparent and obvious to the eye of the expert; if, in general, the conduct and behavior of persons so afflicted, influenced by their mental condition, is " characteristic" and peculiar, it is certainly proper for the expert who has the skill from experience to detect it, to describe its external manifestations in the conduct and behavior of the patient. The testimony of Dr. O'Neal had a tendency to explain why, at this particular time, the prisoner presented the appearance of " an abject and despairing man."

We have examined with great care the whole record in this case, filed with the writ, and we are unable to find any error upon which we feel justified in reversing the judgment of the court below.  The jury have found, after a fair, deliberate, and patient trial, that the prisoner was possessed of a full knowledge of the criminal nature of his act, at the time of its commission, and we cannot disturb their finding.  It is our painful duty, therefore, to affirm the judgment.

Judgment affirmed and it is ordered that the record be remitted to the court of Oyer and Terminer of Adams county for the purpose of execution.