## Commonwealth *v.* Chapman, Appellant.

Argued January 13, 1948. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*James S. Berger,* for appellant.

*Walter Pierre Wells,* District Attorney, for appellee.

OPINION BY MR. JUSTICE PATTERSON, April 22, 1948:·

George Henry Chapman pleaded guilty to an indictment charging him with the murder of his wife. The trial judge, after receiving evidence on behalf of the Commonwealth and defendant, pursuant to the Act of 1939, P. L. 872, §701, 18 PS §4701, adjudged him guilty of murder in the first degree and imposed sentence of death. Chapman has appealed contending that (1) the Commonwealth has failed to sustain the burden of producing evidence sufficient to establish murder in the first degree, and (2) if that burden has been sustained the court abused its discretion by fixing the penalty of death instead of life imprisonment. The judgment and sentence of the court below must be affirmed.

Appellant, a wood-cutter, lived with his wife, Minnie, in a one-room shack in Bingham Township, Potter County. John Downey, a neighbor, on Sunday evening, August 10, 1947, found Minnie Chapman lying on the floor of the shack with her dog beside her. Both had been killed by bullets from a .22 caliber rifle. Chapman, lying on the ground outside the shack, told Downey, "She will never speak to you again, Johnnie." About 10:00 P.M. that evening Deputy Sheriff Carl Butler and T. B. Wise, a Pennsylvania State Police investigator, having been summoned by Downey, found the wife lying on the floor at the foot of the bed, the body of the dog over her left arm and appellant lying on the floor and across her right arm. Believing appellant to be asleep, they handcuffed him and then aroused him. Wise testified: "we examined Mr. Chapman . . . and found that he was living, apparently was asleep and probably intoxicated to the best of our knowledge." He stated further that appellant "seemed to be in sort of a stupor from intoxicants" and that the odor of intoxicants "was pretty strong." Dr. R. W. Gage, who accompanied the police officers, examined Mrs. Chapman and pronounced her dead. Death was caused by a .22 caliber bullet through the heart. Appellant was forthwith taken into custody and, without hesitation, freely made a complete confession, reciting in detail the facts and circumstances surrounding the killing.

On Saturday, August 9, 1947, the day before the killing, appellant and his wife had been in Wellsville, New York, accompanied by John Downey and his wife who reside about 30 feet from appellant's shack. That evening wine and whiskey was purchased by the Chapmans, some of which was immediately consumed and some on Sunday morning. The exact quantity consumed by appellant is unknown. In his signed confession he states that on Sunday morning he borrowed a .22 caliber rifle and shells from Downey, saying that he was going woodchuck hunting. He returned to his cabin and asked

Minnie to bring him a clock hanging on the wall behind her so that he could re-wind it. He was standing at the door, the only entrance to the cabin. She was standing at the far side of the room. When she refused to bring the clock to him, he shot the clock off the wall.[1] "I told Minnie: Mommie, if you don't bring the clock you're going to get it. Then we argued some more. Then I said: 'Mommie, if you don't do what Daddy tells you, you're going to get it.' Then I shot the other clock, which was hanging on the wall above the bed. Then I pointed the rifle at Minnie. She was still standing in the same place. She said, 'Daddy, please don't.' I said, 'Honey, will you say pretty please?' She said, 'Daddy,' and that was all. The rifle was aimed at her heart, and I pulled the trigger." As deceased fell to the floor appellant ordered the dog to get on the bed and then said: "Peggy, take a good look at Mommie. Then I shot Peggy and set the rifle in the corner near the door. Then I took the dog off the bed and laid her on Minnie's arm . . ."

A plea of guilty to the charge of murder is not a plea of guilty of murder in the first degree: *Commonwealth v. Samuel Jones,* 355 Pa. 522, 525, 50 A. 2d 317; *Commonwealth v. Iacobino,* 319 Pa. 65, 178 A. 823. The burden is upon the Commonwealth to establish the essential elements of the higher degree of crime—the specific intent to take human life: *Commonwealth v. Samuel Jones,* supra; *Commonwealth v. Iacobino,* supra; *Commonwealth v. Tompkins,* 267 Pa. 541, 110 A. 275; *Commonwealth v. Bednorciki,* 264 Pa. 124, 107 A. 666. Not only was the specific intent to take life properly inferred from the fatal use by appellant of a deadly weapon upon a vital part of his wife's body (*Commonwealth v. Holley,* 358 Pa. 296, 56 A. 2d 546) but the further evidence that after the first shot had been fired into Mrs. Chapman's heart he reloaded his rifle and fired a second bullet into

---

[1] T. B. Wise testified (N.T. 50-a) : "The Miller 8-day clock was stopped at 1:55 o'clock."

her body, warrants the inference of wickedness and depravity of heart. Inferences are unnecessary, however, where as here, the perpetrator of the crime has stated his intention to kill in clear and unequivocal language soon after the shooting and has not since repudiated it but instead reaffirmed it at the trial. When his signed confession was being prepared, he was asked: "When you pointed the gun at her did you know it was loaded? A. Yes, sir, I did. Q. Did you intend to pull the trigger? A. Yes. Q. Then you shot the gun knowing it would kill her or wound her? A. Right. Q. Did you intend to kill her? A. Yes. Q. When she fell to the floor why did you reload the gun and fire the second shot? A. To make sure she was finished." Having regard to this clear expression of appellant's specific intent to kill, the trial judge properly found appellant guilty of murder in the first degree. The Commonwealth has sustained the burden of proof in this regard.

Appellant contends that there is "fairly preponderating evidence" of intoxication which requires that the judgment of first degree murder be set aside. Intoxication which will negative plan, premeditation and intent to kill must subvert conscious purpose: *Commonwealth v. Iacobino,* supra; *Commonwealth v. Detweiler,* 229 Pa. 304, 78 A. 271; *Commonwealth v. Cleary,* 135 Pa. 64, 19 A. 1017. Mere intoxication of a defendant will not excuse or palliate the offense. He must have been sufficiently intoxicated as to be incapable of conceiving any intent: *Commonwealth v. Cleary,* supra, 75. The defense of intoxication is an affirmative one. Appellant has not sustained the burden upon him of establishing by "fairly preponderating evidence" that his intoxication prevented him from forming the requisite intent: *Commonwealth v. Iacobino,* supra, 68. The great preponderance of the evidence is to the contrary.

Appellant drank some wine Saturday night and "quite a little bit" before eating breakfast at 8:30 A.M. Sunday, and more after breakfast. However, he and

Downey each drank a bottle of beer about 11:00 A.M. and Downey testified that "he was not intoxicated at that time." It is clear from his own admissions in open court that he was sufficiently possessed of his faculties to hit two clocks on the wall and a slop bucket outside the shack. Immediately after his arrest, and on two later occasions, he told a lucid, connecting and detailed recitation of events surrounding and following the shooting. On all occasions he was able to account for six shots which was the exact number of fired shells found by the officers. Immediately after his arrest he exhibited an acute awareness of the seriousness of his offense.[2] The conclusion is inescapable that appellant knew what he was doing when he shot his wife and that he intended the consequences of his acts. To hold otherwise is to remain oblivious to reality. The conclusion that the murder was wilful and premeditated was proper.

The remaining assignments of error concern the alleged abuse of discretion by the court below in fixing the penalty of death. Counsel for appellant has argued that the usual motives found in a killing are absent. The language of Mr. Justice JONES in *Commonwealth v. Pepperman,* 353 Pa. 373, 377, 45 A. 2d 35, is peculiarly applicable here: "On the basis of the record now before us we fail to perceive how we could justifiably hold that the trial court had abused its discretion in sentencing the defendants to death. The mitigating circumstances in favor of an offender who has acted from

---

[2] T. B. Wise testified (N.T. 46a and 47a) : "He started out by wanting to leave there. Also stated he wanted to go to the chair. He was asked why in order to bring it out. He said 'for murder.' I asked him who he had murdered. He said, 'I killed Minnie.' He said he wanted to go and get it over with right away. He got more talkative while we were there and insisted on going and getting it over with as far as he was concerned, and he subsequently was removed from there and brought to the County Jail where he was confined."

emotional stress and who had a prior record of law-abiding nature and habits, which is sufficient to justify a court 'in fixing the lesser of the two penalities' (Commonwealth v. Sterling, 314 Pa. 76, 78, 170 A. 258), are not present in the instant case. Cf. Commonwealth v. Irelan, 341 Pa. 43, 46-7, 17 A. 2d 897; Commonwealth v. Garramone, 307 Pa. 507, 514-515, 161 A. 733." There are no mitigating circumstances arising from emotion, pressure of circumstances or otherwise.

This record is replete with evidence conclusively establishing wilful, deliberate, premeditated murder. Admissions of appellant made on several occasions clearly express the intention to kill. Equally conclusive of his intent to kill are facts and circumstances surrounding the killing. To carry out this intention he prepared by borrowing from his neighbor a deadly weapon—a gun and shells—with which to consummate his wicked plan to take life. That he was fully aware of the consequences of his act is evidenced by the fact that he took careful aim and fired a shot into the heart of the victim and then, to make certain that he had accomplished his purpose, he callously reloaded and fired a second shot through the prostrate form on the floor before him. Any conclusion other than guilty of murder in the first degree with penalty of death would not be consonant with the facts presented in this record.

Judgment affirmed.

---

CONCURRING OPINION BY MR. CHIEF JUSTICE MAXEY:

I concur in the majority opinion. I think Chapman is guilty of murder in the first degree. His specific intent to take his wife's life was clear. He was only 16 feet away from his wife when he pointed the gun at her and fired not once but twice. His murder-lust not being satiated he then shot his wife's dog and laid it on her arm. He then calmly ate a piece of cold potato. The

officers did not arrive at the cabin until eight hours after the shooting. The fact that defendant appeared at that time to be "considerably intoxicated" throws no light on his degree of intoxication at the time he killed his wife.

The fact that the defendant did not shoot his wife *exactly through the heart* does not tend in any degree to exculpate him. He shot her in the right breast. When any person standing 16 feet from another person points a loaded gun at that person's chest area and pulls the trigger, the reasonable inference is that he intends to take that person's life. The fact that the defendant testified before the court that he did *not* intend to take his wife's life is of little evidentiary value. By the time he so testified, he apparently realized his plight and considerations of calculated policy were in the ascendant. On the day following the homicide, before defendant had had time to think much about it, he told the police that he intended to kill his wife. What he said *on that day* outweighs in my estimation what he said five weeks later.

In order for defendant's drunkenness to excuse his crime, it must be such a degree of inebriety that he did not understand the nature and consequences of his act. The evidence in this case does not indicate that defendant was as drunk as that. When he made his statement to the police he had no difficulty in recalling in detail just what took place when he killed his wife. If he was as drunk as he wishes us to believe he was, he would not have been able to perform this feat of memory. In *Commonwealth v. Iacobino,* 319 Pa. 65, 178 A. 823, this Court said: " . . . when the defense is intoxication, the burden is on the defendant to establish that his intoxication was such as to prevent forming any intent [to kill]. 'The mere intoxication of the defendant will not excuse or palliate his offense unless he was in such a state of intoxication as to be incapable of conceiving any intent. If he was, his grade of offense is reduced to murder in the second

degree': Com. v. Cleary, 135 Pa. 64; Com. v. Detweiler, 229 Pa. 304, 308." Defendant in this case did not meet this burden.

It is undoubtedly true that defendant's family history shows that his father and grandfather indulged in alcoholic drinks steadily and sometimes excessively and that defendant himself claims that he drank hard for the past three years. Most criminals have unfortunate family histories but society's need of protection from criminals regardless of their family history is the paramount consideration of the courts. Not every vicious or sadistic criminal is legally insane. In fact no plea of insanity was advanced for this defendant. Robert H. Israel, M.D., Superintendent of the Warren State Hospital, in his report to the court under date of September 5, 1947, said, inter alia: ". . . while we feel that this man has borderline intelligence, he is free from any mental disease. . . . we must conclude that this man knows the difference between right and wrong, understands the nature of his acts, and is responsible for his acts."

President Judge LEWIS of the court below correctly pointed out in his opinion that mere anger or vindication in murdering a human being is not sufficient to save the murderer from the extreme penalty. He cited several cases in support of this proposition. Judge LEWIS aptly said: "Here the defendant's anger was aroused by his wife's refusal to bring him a clock not over eighteen feet away. There were no mitigating circumstances arising from emotion or pressure of circumstances but rather a reckless disregard for the consequences and callous, wanton destruction of human life."

I would affirm the judgment and sentence.

———

DISSENTING OPINION BY MR. JUSTICE HORACE STERN:

The Act of February 15, 1870, P. L. 15, section 2, provides that "In all cases of murder in the first degree . . .

it shall be the duty of the judges thereof [the Supreme Court] to review both the law and the evidence, and to determine whether the ingredients necessary to constitute murder in the first degree shall have been proved to exist; and if not so proved, then to reverse the judgment and send the same back for a new trial, or to enter such judgment as the laws of this commonwealth require."

Reading and re-reading the testimony in this case, I cannot agree with the decision of the court below, and now of this Court, that the record supports a conviction of murder in the first degree.

It is elementary that intoxication sufficient to deprive the mind 'of power to form a design with deliberation and premeditation and properly to judge the natural, ordinary consequences of an act, will prevent such a conviction. In the present case it seems to me an inescapable conclusion that the defendant was intoxicated to such an extent that he was incapable of deliberation, premeditation or intent. There are facts not stated in the majority opinion which seem to me important, others that seem to me to be understressed, and still others from which I think incorrect inferences have been drawn.

The report of the psychiatrist at the Warren State Hospital states that defendant's family history shows "the steady, and often excessive use of alcohol, by the grandfather, father and brothers"; that defendant "drank hard" and "his companions are, for the most part, alcoholics"; that his wages "went invariably to the bottle"; that he admitted he has been "drinking hard for the past three years"; that he "had to drink every payday"; that he "craved it" and "couldn't get enough of it". The diagnosis by the psychiatrist was "chronic alcoholism".

So much for defendant's background. Coming more closely to the time of the murder, it appears that defendant and his wife had been out on Saturday, the day

before the shooting, with their friends, the Downeys, drinking. On Sunday morning they started in drinking again and kept it up "off and on" until the shooting occurred. In the latter part of the morning defendant borrowed a .22 calibre rifle from Downey, not, as the majority opinion assumes, in order to prepare to kill his wife, but to go woodchuck hunting; indeed when he borrowed the gun he asked Downey if he would take him and his wife later in the day to Portville, thus showing that he had no thought at that time of killing his wife.

Downey tells of the purchase of all the liquor. Defendant drank a mixture of beer, wine and whiskey.

The facts of the killing are narrated by defendant; there were no witnesses present. Were defendant's acts, as revealed by him, those of a sane, sober person acting with design and deliberation? Let them speak for themselves, having in mind that he and his wife had been married for only four months, had always got along "good together", and had never had a quarrel, so that defendant had not the slightest motive of any kind for taking her life. After the drinking by both himself and his wife he started with the rifle to go woodchuck hunting, but, noticing that the clock had stopped, he asked his wife to hand it to him so that he might rewind it. She said "no". The clock was on the wall and he fired a shot into it. She said "please don't". He asked her to say "pretty please". She wouldn't say it. He shot into another clock which was standing on a ledge. Then he went out of doors and fired there into a slop-jar. He came back and stood in the doorway; his wife stood at the head of the bed; they were thus as far apart (16 feet) as they could get in that small cabin. He pointed the gun at her and fired twice. They had a dog of which both of them were very fond. He called the dog up on the bed and said to it: "Peggy, take a good look at Mommy". Then he shot the dog dead, picked it up, and laid it on his wife's arm; (afterwards he told the sheriff that "Minnie wanted

to have the dog die with her"). Putting the gun down he ate a piece of cold potato with mustard on it, took another drink, kissed his dead wife, and then apparently "passed out" completely. Later Downey found him lying in front of the cabin and aroused him, whereupon defendant called "Minnie", thereby showing that he did not even remember that he had killed her. When the officers of the law came to the cabin some eight hours after the shooting they found him lying on the arm of his wife opposite to the dog, and, as they testified, he appeared to be "in a stupor from intoxicants", and they could smell the odor of drink throughout the entire cabin. An investigator connected with the Pennsylvania State Police testified that defendant appeared to be "considerably intoxicated". A two quart wine and a pint whiskey bottle were both found empty. Defendant was in a "dazed or groggy condition" and "the odor of alcohol around there" was "extensive" and "very apparent" upon the defendant. A member of the State Police testified that defendant "appeared to be in a stupor when he got on his feet". The owner of the farm on which defendant lived testified that when he saw him, as did Downey, lying near the door of the cabin, he had the appearance of being "just darn good and drunk". We thus have an abundance of testimony not only as to the amount and kind of liquor defendant had been consuming and the stuporous effect it had upon him, but also as to his actions which, speaking louder than words, show plainly that, so far from deliberating, premeditating or designing the killing of his wife, he had not the faintest comprehension of what he was doing or what was going on around him.

The majority opinion relies heavily upon the alleged fact that defendant shot his wife *through the heart* and applies therefore the well known factual presumption that one who uses a deadly weapon upon the vital part of the body of another must be deemed to have intended

the natural consequences of his act. *But the evidence does not indicate that defendant aimed the gun at his wife's heart. On the contrary,* the medical testimony is clear to the effect that the bullet entered the *right* breast and then, by a mere trick of fate, struck a rib which deflected it over toward and into the heart; the second bullet, which caused merely a trivial flesh wound, also entered the right breast and emerged therefrom parallel to the chest. Another fact which I think is unduly stressed in the majority opinion is that, in a statement made the following day to the police, defendant said that he intended to kill his wife; the majority opinion overlooks the fact, however, that defendant testified that he had no such intention. Thus in regard to the three factors upon which the present decision of the court seems principally to be based, two of them, namely, that defendant borrowed the gun for the purpose of killing his wife and that he aimed it at her heart, are directly refuted by the undisputed testimony, and the remaining one, that he confessed that he intended to kill her, must be weighed in the light of his statements and testimony to the contrary.

I think the court below gravely erred in finding defendant guilty of murder in the first degree with the penalty of death. Where there is a plea of guilty to an indictment of murder the burden is upon the Commonwealth to raise the grade of the crime from second to first degree; here the Commonwealth, in my opinion, failed to sustain that burden. Therefore, in accordance with the Act of 1870, I would reverse the present judgment, and, in its place, enter a judgment that defendant is guilty of murder in the second degree.

Mr. Justice JONES joins in this dissent.