Commonwealth *v.* Logan, Appellant.

Argued November 8, 1948. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Ralph F. Fisher*, with him *Palmer C. Bortner*, for appellant.

*Clarence M. Lawyer, Jr.*, Assistant District Attorney, with him *Harold B. Rudisill*, District Attorney, for appellee.

OPINION BY MR. JUSTICE LINN, January 3, 1949:

The jury found the defendant guilty of murder of the first degree and fixed the penalty at life imprisonment. A motion for a new trial was made; after hearing by the court in banc the motion was dismissed. The defendant was sentenced and has appealed.

The first assignment of error is that "the evidence in this case does not support a verdict of murder in the first degree." We have examined the record, as required by the Act of February 15, 1870, P. L. 15, section 2, 19 PS 1187, for the purpose of determining whether the ingredients of murder of the first degree appear in the record and we are satisfied that they do appear. Our reasons for the conclusion will appear as we deal with the circumstances of the shooting.

In February, 1947, defendant was 29 years of age. He was employed as a garage mechanic by his brother with whom he made his home after separating from his wife about three weeks before. On February 12, 1947, he bought a revolver; his war experience gave him familiarity with weapons. His wife had left the apartment occupied by them and for a period of between two and three weeks resided in the neighborhood with a widow, Mrs. Hazel Wagner. At about 8.45 on the evening of February 16, 1947, he drove to the home of Mrs. Wagner "to try" as he said "to get [his wife] to come back." When he reached Mrs. Wagner's house he saw his wife and Mrs. Wagner "sitting in the front room . . . right inside the window." He "rang the bell, or rapped on the door" and Mrs. Wagner answered by

opening the door. He told her that he wished to see his wife and testified that Mrs. Wagner said, "If you want to see Pauline, go to see her lawyers." Among other things, defendant testified: "I said, 'Please leave me see her.' I begged her, and my nerves, I was just shaking all over, I got pain in the back of my head and I didn't know—I just blacked, that is all, I just couldn't see, and thought I heard people coming towards me, and I didn't know whether they were or not, but there was a lot of racket back of me, and stuff, and I fired a shot to try to get away. Q. Did you direct that shot at any person? A. No, sir. Q. Did you come there with the intention of killing anybody? A. No, sir. Q. Did you intend to kill your wife? A. No, sir. Q. Did you intend to kill Hazel Wagner? A. No, sir. Q. Where did you find that gun? A. I didn't know that gun was in my pocket. Q. When did you first discover that it was in your pocket? A. When I was on the porch of Hazel Wagner's." The jury rejected that account of what occurred and adopted another account given by witnesses fully supporting its verdict. The evidence would have justified the jury in finding that the shooting occurred at 8.50. Officer Kinneman testified that he arrived at Mrs. Wagner's house at about 8.57 in response to a telephone call and found Mrs. Wagner lying on the porch; he asked her what had happened. "A. She said, 'Grant Logan wanted to see his wife and I told him to go see her lawyer. I coaxed him. *I begged him to give me that gun.* Then he shot me.' " That was about seven minutes after the shooting. Mrs. Wagner had been shot in the abdomen. She was taken by ambulance to a hospital in York, Pennsylvania, arriving at 9.10 P.M. She died at 10.10 P.M. About ten minutes after her arrival at the hospital Officer Moul asked her what had happened and received the same reply made to Officer Kinneman on the porch at about 8.57 P.M. Miss Selmser, a nurse in the hospital, testified "A. Well, when I was getting her undressed in

bed, she said that she was dying. Q. What did she say? A. She said, 'I am dying.' Q. Did she say that more than once? A. Yes, during the time that we were undressing to give her the plasma, and gave her other treatments, she said it. I don't know how many times. Q. Were you present when she died? A. Yes, I was. . . . Q. Would you be able to estimate how soon after she was admitted as a patient it was she made this statement that she was going to die? A Well, it wasn't any more than ten minutes." These statements of impending death were made before the deceased spoke to either Officers Moul or Kinneman at the hospital.

Dr. Zarfoss, resident physician in the hospital, testified that he examined Mrs. Wagner, described the bullet wound, and stated that she was suffering marked shock. He was asked, "Q. What did she state? A. Well, she believed she was going to die and she repeated that statement several times. We, of course, tried to reassure her, but she still believed that she was going to die."

During defendant's examination he was asked, "Q. You remember clearly pulling out the gun? A. I remember showing it to Mrs. Wagner. Q. Do you remember saying to Mrs. Wagner, 'Maybe this will persuade you to let me in'? A. I didn't say anything like that that I recall. Q. You don't remember that? A. No, sir."

When asked why he bought the gun he said, "A. I bought it for past time. There was a lot of rats in the bottom of the garage. It is a ground floor down there and I bought it to go down there to shoot rats in my spare time."

After shooting Mrs. Wagner the defendant got into his car and drove some distance away and fired three shots into his chest and shoulder. He said he "went numb." He threw away the gun and between 1.15 and 1.30 A.M. February 17th he drove to the West Side hospital in York. He told the officers at the hospital where they would find the gun; they found it at the described

spot, took it to the hospital where he identified it by number as his gun. The bullet found in the body of the deceased admittedly came from this weapon.

At the conclusion of the Commonwealth's case, counsel for defendant moved "that the first count in the bill of indictment, to wit, murder, and particularly that part of the first count which involves murder of the first degree, be stricken from the indictment at this time for the reason that the Commonwealth has failed to prove any motive in any killing involved, or any intention whatsoever to kill, which of necessity, therefore, would reduce a degree of murder to that of second degree; and for the additional reason that the presumption of law never raises a killing beyond second degree murder implying malice."

The learned trial judge dismissed the motion and held that as death had apparently resulted from the use of a gun fired by defendant upon a vital part of the victim's body the degree of murder was a matter of fact to be determined by the jury. Our cases require that decision: *Com. v. Wucherer,* 351 Pa. 305, 311, 41 A. 2d 574, 577 (1945); *Com. v. Zec,* 262 Pa. 251, 257, 105 A. 279, 281 (1918); *Com. v. Drum,* 58 Pa. 9, 17 (1868).

The argument for the defendant proceeds on the assumption that "defendant's testimony shows that he had no intention of hitting anyone." There is no requirement that the jury believe the accused. The sole requirement is that there be sufficient evidence to justify the jury's verdict which imports the finding of a specific intent to kill.

Under the Act of 1870 when the elements of first degree murder appear in the record and there are no trial errors, the function of this Court ends. See *Com. v. Caliendo,* 279 Pa. 293, 297, 123 A. 797, 798 (1924); *Com. v. Blanchard,* 345 Pa. 289, 295, 26 A. 2d 303, 306 (1942), reargument denied 345 Pa. 296, 27 A. 2d 48 (1942) and cases there cited. It is not within the

province of this Court to pass on the credibility of the witnesses; we accept as true all of the Commonwealth's evidence upon which, if believed, the jury could have properly based its verdict: *Com. v. Blanchard,* 345 Pa. 289, 296, 26 A. 2d 303, 306 (1942). See also *Com. v. Karmendi,* 328 Pa. 321, 324, 195 A. 62, 63 (1937); *Com. v. Watkins,* 298 Pa. 165, 168, 148 A. 65, 66 (1929); *Com. v. Carelli,* 281 Pa. 602, 605, 127 A. 305, 306 (1925); *Com. v. Priest,* 272 Pa. 549, 550, 116 A. 403 (1922); *Com. v. Diaco,* 268 Pa. 305, 306, 111 A. 879, 880 (1920).

Appellant complains that the court received in evidence the two declarations, related, above, made by the victim. The first one made, perhaps seven minutes after the shooting, was a statement res gestæ and therefore admissible. The fact that the deceased made her statement in response to the question, "What happened?" did not destroy the spontaneity which is a necessary characteristic of res gestæ statements. In *Com. v. Lehman,* 309 Pa. 486, 495-6, 164 A. 526, 529 (1932), the deceased about ten minutes after the shooting identified his assailant in response to the question "Who did it?" What we said there may appropriately be quoted here. "In the circumstances, the accusation is admissible, within the res gestæ rule, as having been made so soon after the shooting as to be part of the general event and, also to exclude any presumption that the statement resulted from premeditation or design. The application of the rule involves the wise exercise of judicial discretion in determining whether a challenged expression is in fact part of the transaction, and therefore admissible, or is a narrative of past events made after the transaction may be said to be fully ended, and therefore inadmissible."

In *Com. v. Werntz,* 161 Pa. 591, 596-7, 29 A. 272, 273 (1894), we adopted the definition of Wharton on Evidence, Sec. 259, that "the res gestæ are the circumstances which are the undesigned incidents of the litigated act,

which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. .... Their sole distinguishing feature is that they should be the necessary incidents of the litigated act; necessary in this sense, that they are part of the immediate preparations for, or emanations of such act, and are not produced by the calculated policy of the actors." The requirement that the statement be spontaneous does not mean that it must be ejaculatory. See *Com. v. Rumage,* 359 Pa. 483, 485, 59 A. 2d 65, 67 (1948); *Com v. Harris,* 351 Pa. 325, 336, 41 A. 2d 688, 694 (1945), in which are discussed such statements in response to questions such as "What happened?".

The repetition of the same statement made to the officers was a dying declaration; she thought and she said she was dying and died within a few minutes: compare *Com. v. Jones,* 341 Pa. 541, 546, 19 A. 2d 389, 392 (1941); *Com. v. Puntario,* 271 Pa. 501, 505, 115 A. 831, 832-3 (1922).

Defendant pleaded not guilty and, in support of that plea, testified and offered evidence to support a finding that at the time of the shooting he was not capable of knowing what he was doing, of distinguishing right from wrong, of forming "any wilful and deliberate or premeditated intention to kill." A brief outline of what this condition was said to be based on may be given. He entered the military service in November, 1943. After about seventeen weeks basic training in this country, he was sent overseas where he arrived in June, 1944. He served in the 79th Division. While on the witness stand he stated that on February 16, 1947, he was "very nervous." In reply to a question he was asked, "When did this nervous condition develop?" He then went on to describe that it began in the Argonne Forest; he served in the "heavy weapons company"; he was wounded, "had shrapnel in my left arm here" indicating

fore-arm. He also "got a gunshot wound in the foot, and shrapnel in the arch of the foot." There were six or seven operations on his foot. For a time he was a machine gunner and described at length the resulting nervous condition. He was in a hospital in France from which he was sent to England "by plane on a litter"; after some treatment at the 74th General Hospital in England, he appeared before some board that found "through nervousness and shell shock, I had psychoneurosis." He was returned to the United States February 10, 1945, was discharged through Camp Edwards and was sent on a hospital train to Camp Pickett, Virginia. It was discovered there that he was suffering with peptic ulcers and after some treatment was finally released from the army May 28, 1945. Coming closer to the period of the murder he was asked, "Q. Now, when you started working for your brother at Glen Rock, what type of work did you do for him? A. Mechanic in a garage. Q. What was your nervous condition after you started working for your brother? A. It was all right as long as I was left alone. Nothing worked on my nerves. I mean, if things went right, I was all right, but after my wife and I had separated, it didn't go at all. I just couldn't do a job, that's all. I tried to do work for people and I couldn't finish it. Q. You say you were having trouble getting along with your wife? A. Yes, I had a little difficulty." In describing the effect on him of his separation from his wife he testified, "Q. What happened after you separated? A. Well, my nerves just went bad. I just couldn't go anymore, that's all. My nerves just got the best of me and I just couldn't eat. I tried to do work for people on automobiles. It didn't work, I couldn't do the job."

Defendant's counsel, in their effort to persuade the jury to adopt their view of dependant's irresponsibility on the evening of February 16, 1947, called a medical expert whose testimony the Commonwealth then at-

tempted to rebut by the evidence of other physicians. On this point one physician was called on behalf of the defendant and two on behalf of the Commonwealth. Appellant now makes several complaints with respect to this evidence. The first relates to the evidence given by Dr. Cohen. He was, and for many years had been, the jail-physician and had had psychiatric experience over a period of twenty-six years. On the morning after the shooting, he examined the defendant and thereafter examined him once a week until the trial August 25, 1947. He was asked whether, as a result of the examinations he had made "any diagnosis as to [defendant's] mental condition." When asked to state what opinion he had formed on the subject defendant's counsel objected on the ground that counsel "did not know the facts which were given to him by defendant upon which he bases his opinion and diagnosis." The court properly overruled that objection.

The testimony of Dr. Cohen was based upon personal observation and examination and it was not therefore necessary to pose any hypothetical questions to him. In *Coyle v. Commonwealth,* 104 Pa. 117, 132 (1883), we said, "In cases [involving] the question of insanity a medical expert may of course give his opinion based upon personal examination and knowledge of the patient; but where he is not possessed of a personal knowledge, his opinion must as we have said in Rouch v. Zehring, 9 P. F. Smith 74 'be predicated of the facts proved or admitted, or of such as appear in evidence hypothetically stated,' . . . " Wigmore on Evidence, section 675, states, ". . . since it is the essential nature of conclusions that they are always relative to and dependent upon the premises, is not every offered opinion or conclusion hypothetical in its nature, whether the witness himself supplies the testimony to the premises or whether they are assumed in the question and then supplied by other testimony? This is certainly so. Even

though the physician testifies himself to seeing the congestion of the windpipe, and then infers from these premises a death by strangulation, the jury may later decide that there was no congestion, and thus the opinion based on this premise fails also. Thus all opinions or conclusions are in a sense hypothetical.

"But does it follow that, when the opinion comes from *the same witness* who has received the basis of it by actual observation, those premises must be stated beforehand, hypothetically or otherwise, by him or to him? For example, the physician is asked, 'Did you examine the body?'; 'Yes'; 'State your opinion of the cause of death.' Is it here necessary that he should first state in detail the facts of his personal observation, as premises, before he can give his opinion?

"In academic nicety, yes; practically, no; and for the simple reason that either on direct examination or on cross-examination each and every detail of the appearance he observed will be brought out and thus associated with his general conclusion as the grounds for it, and the tribunal will understand that the rejection of these data will destroy the validity of his opinion. "Through failure to perceive this limitation, Courts have sometimes sanctioned the requirement of an advance hypothetical statement even where the expert witness speaks from personal observation: . . . " :

The court below asked the witness, "Q. So, as a result of your observation, I take it, that any opinion or diagnosis which you made was made not only as a result of observation but also of your examination, was it not? A. That is right, your Honor." The defendant's counsel had ample opportunity to cross examine the witness to elicit the detailed data upon which he based his opinion.

The defendant had called a physician, Dr. Transeau, who also practiced psychiatry. Dr. Transeau was asked a hypothetical question that occupies six printed pages

of the record; the question ended as follows: "Q. Now, Doctor, assuming these facts which I have just stated to you, can you state whether or not on February 16, 1947, at about eight-forty-five to eight-fifty, at the time a shot was fired from the gun or revolver of the defendant, the defendant was able to form at that time a wilful and deliberate and premeditated intention to kill?" "A. I believe that he was not able to form such an opinion . . . A. He was not able to form any opinion or intention to commit a wilful, deliberate murder." The doctor testified that in his opinion defendant was not able to distinguish right from wrong, or understand the nature and consequences of his act; that he was of unsound mind. Asked to give a name to this form of illness he said, "I believe he probably was suffering from the depressed type of manic depressive psychosis." He examined plaintiff a few days prior to the trial when, he said, defendant "seemed to be mentally well then." The Commonwealth in rebuttal called a physician who was largely engaged in psychiatry. The Commonwealth read to this witness the hypothetical question submitted to the expert called to testify on behalf of defendant. The witness, Dr. Heim, testified he was in court during the trial, and that he heard Dr. Transeau's testimony. He was then asked the same question and he testified that assuming the facts stated in the question defendant was able on February 16, 1947, at 8:45 to 8:50 P.M. to form a wilful, deliberate and premeditated intention to kill; that he had the ability to form an intention to commit the act with which he was charged; that he was at that time capable of distinguishing right from wrong, was mentally competent to comprehend and understand the nature and consequence of his act, that he was then of sound mind. He testified that in his opinion defendant was suffering from psychoneurosis. He declined to characterize defendant's condition at the time of the murder as manic depressive psychosis and gave reasons

for his view. The subject was covered in the instructions to the jury inter alia, "That is the crux of the whole case, it seems to me, as far as the defense is concerned, and your verdict will largely depend upon how you view the fact as to the defendant's ability to distinguish between right and wrong at the time the killing occurred." The plea was not guilty; there was no formal plea of insanity; all the evidence on the subject came in under the plea of the general issue. We have outlined defendant's contentions at some length so that it may appear that he was given ample opportunity to present his case in defense. Nothing more in defendant's brief requires discussion.

The assignments of error are overruled, the judgment is affirmed, and the record is remitted to the end that the sentence may be carried out.