Antonio Gidaro entered a plea of not guilty to an indictment charging him with the murder of Michael Matzura. The jury found him guilty of murder in the first degree and fixed life imprisonment as the penalty. Gidaro moved for arrest of judgment and a new trial. The motion was dismissed, after argument before the court en banc, and a new trial refused. Gidaro appeals.
The time of the offense was December 25, 1947, at about 7:00 p.m., and the place was Ashland Hill Road, Mount Carmel, Northumberland County, opposite a building owned by appellant, located on the south side of the highway. The western portion of the building was occupied by one Walter Frasch, lessee of appellant, as a gasoline filling station, and the eastern portion, consisting of a one-car garage, was used by appellant to store his car. Appellant had gone to the garage to get his automobile and, finding another car parked in front of the garage doors, he complained to Frasch, who backed it out of the way. Appellant was carrying a revolver at the level of the tenth rib, toward the left side of the ment ensued between appellant and Frasch over the blocking of the garage doors. Attracted by the argument, Joseph Matzura, son of deceased, Mrs. Frasch and Robert Frasch, brother of appellant's lessee, all of whom *Page 474 
were inside the gasoline station, came outside, and as they did so appellant picked up an iron bar used to hold the garage doors open. Joseph Matzura picked up another iron bar. Michael Matzura, the deceased, then came out of the gasoline station and stepped between his son and appellant, stating that he did not want any trouble. Frasch took deceased by the sleeve, deceased stepped back out of the way, and Frasch and appellant resumed their argument. Deceased left the scene, walking in a northwesterly direction toward his home and Mrs. Frasch, Robert Frasch and Joe Matzura walked toward the service station. Suddenly appellant broke off the argument with Frasch and ran north across Seventh Street and fired three shots in the direction of deceased, who was walking slowly along the northerly side of the street, with his back toward appellant and his hands in his pockets. The second shot was fired from a distance of nine to ten feet away and the third from a distance of only six feet, after Matzura had doubled up and was falling to the ground. One of the three shots imbedded itself in a building on the north side of the street, but the other two found their mark in the body of deceased. One of these two shots entered the back of the right shoulder and passed through the body to emerge from the front of the right shoulder, without affecting any vital organ. The other shot, which proved to be the fatal one, entered the right lumbar region of Matzura's back, at the level of the first lumbar vertebrae, three and one-half inches from the midline of the body, passed through the first lumbar vertebrae, then through the aorta, a large blood vessel of the body, severing it, then through the pancreas, nicking the transverse colon at the splenic flecture, and through the lateral attachment of the diaphragm, lodging in the lateral chest wall, at the level of the tenth rib, toward the left side of the body. Matzura died shortly after the shooting, while enroute to a hospital, as a result of internal hemorrhage *Page 475 
due to the perforation of the abdominal portion of his aorta.
Appellant's defense was that he had no intention to shoot or kill Matzura and that the killing was purely accidental. He testified that Joseph Matzura had first picked up a bar; that he was frightened and proceeded toward his home; that his position was between Joseph Matzura and deceased; that he heard shots being fired; and that he shot his revolver without intending to kill anyone, but for the purpose of scaring off those who he thought were assailing him.
The only questions are (1) whether the trial judge erred in admitting into evidence the Commonwealth's Exhibits 1 to 4, inclusive, consisting of photographs of the scene of the crime, and (2) whether it was error to refuse to instruct the jury, as a matter of law, that the Commonwealth failed to prove beyond a reasonable doubt a specific intent to take life, and therefore the verdict could rise no higher than murder in the second degree.
This appeal is singularly lacking in merit. Appellant recognizes the established rule that the admission into evidence of photographs showing the location and scene of the crime is a matter within the sound discretion of the trial court, but contends that in this case the court below abused its discretion, on the ground that the photographs were made in the daytime whereas the crime was committed after dark. Had the photographs been admitted for the purpose of proving visibility at the time of commission of the offense, there would be some basis for objection. They were not offered or admitted for such purpose, however, but merely for the purpose of showing the general location. In overruling appellant's objection to the photographs, the trial judge stated that they were admitted "for the purpose of showing the general location and the structures there, but not as evidence of movable objects." In his charge, he again *Page 476 
emphasized that the photographs were "offered in evidence, and were admitted for the purpose of showing the physical characteristics of the surroundings where this alleged killing was to have taken place." The jury were further instructed that "as you view the pictures, you must take into consideration the fact that they were taken in the daytime and that the alleged shooting took place between seven and seven-thirty in the evening and it was dark; so when you look at these pictures they are only for the purpose of showing the location of the buildings, width of the street, and permanent stable features of the neighborhood where this affair was alleged to have taken place."
Logically, the rule contended for by appellant would not only exclude photographs of the scene in cases of crimes and accidents occurring at night, but would also exclude any other form of evidence, including oral testimony, to show the actual physical conditions, locations, and measurements. In a large class of cases, the court and jury would needlessly be deprived of a knowledge of the location necessary to enable them properly to evaluate the conduct of the parties, and the ends of justice would be defeated. Such a rule, as often as not, would operate to deprive a defendant of his rights, and would amount to an unwise and unwarranted departure from established principles. As said in Beardslee v. Columbia Township, 188 Pa. 496,502, 41 A. 617: ". . . photographs of the scene of an accident taken at or near to the time are not always obtainable, and bearing in mind the object sought, the assisting of the jury by knowledge of the locality to judge the conduct of the parties with reference to the issue raised, the only practicable rule would seem to be that the changes must not be such as to destroy the substantial identity, and that the changes whatever they are must be carefully pointed out and brought to the jury's attention. This would have to be the course pursued if a view were *Page 477 
allowed to the jury at the trial, and no other appears practicable in regard to plans, photographs or other substitutes for a view. With these safeguards the subject must be left largely to the discretion of the trial judge." See alsoCarney v. Pennsylvania Railroad Company, 63 Pa. Super. 138,141; Taylor v. Bland, 77 Pa. Super. 551, 553; Henry on Evidence, 3rd ed., section 225. It is not contended that there was any change in the physical condition of the locality between the date of the offense and the date the photographs were taken, or that they did not accurately and truthfully represent the places and objects photographed, and the jury were carefully instructed as to the limited purpose for which the evidence was offered and received. Manifestly, the trial judge did not abuse his discretion in this regard.
Appellant concedes that the specific intent to take life may properly be inferred from the use of a gun upon a vital part of the body, but argues that such inference is permissible only where it is established that the bullet entered directly into a vital organ (citing the dissenting opinion in Commonwealth v.Chapman, 359 Pa. 164, 58 A.2d 433), and that even where this appears, the inference may not be permitted if the defendant testifies that he did not intend to kill (citing Commonwealthv. Kluska, 333 Pa. 65, 3 A.2d 398). In the Chapman case, defendant fired two shots into his victim, from a distance of sixteen feet, and neither shot directly entered a vital organ. The first shot, which proved to be the fatal one, entered the victim's right breast but was deflected into the heart by striking a rib, and the second shot, which also entered theright breast, emerged parallel to the chest, causing only a flesh wound. Nevertheless it was held (pp. 167-168): "Not only was the specific intent to take life properly inferred from the fatal use by appellant of a deadly weapon upon a vital part of his wife's body (Commonwealth v. Holley, 358 Pa. 296, *Page 478 56 A.2d 546) but the further evidence that after the first shot had been fired into Mrs. Chapman's heart he reloaded his rifle and fired a second bullet into her body, warrants the inference of wickedness and depravity of heart." The fatal bullet discharged by appellant into the body of Michael Matzura entered an area containing organs necessary to the continuance of life, and according to the undisputed medical testimony Matzura's death was in fact caused by the severance of the abdominal portion of the aorta. Proof that the bullet entered the body at the exact location of a vital organ or part was not required. In the concurring opinion in the Chapman case it was said (p. 171): "The fact that the defendant did not shoot his wife exactly through the heart does not tend in any degree to exculpate him. . . . When any person standing 16 feet from another person points a loaded gun at that person's chest area and pulls the trigger, the reasonable inference is that he intends to take that person's life. The fact that the defendant testified before the court that he did not intend to take his wife's life is of little evidentiary value. By the time he so testified, he apparently realized his plight and considerations of calculated policy were in the ascendant." See alsoCommonwealth v. Scott, 284 Pa. 159, 130 A. 317; Commonwealth v.Logan, 361 Pa. 186, 63 A.2d 28.
In Commonwealth v. Kluska, supra, the trial judge had instructed the jury, in effect, that use of a deadly weapon upon a vital part of the body of another gave rise to an irrebutable presumption of intention to kill. This was prejudicial error, of course, and required the granting of a new trial. There is nothing in that decision, however, to support appellant's proposition, as dangerous as it is novel, that defendant's mere denial that he intended to kill is sufficient as a matter of law to overcome the presumption. As recognized in the opinion in that case, the presumption is one of fact, not *Page 479 
of law, and therefore may be overcome by the assailant's denial of such intent, or other appropriate evidence, but the effect of such evidence is for the jury. There is no requirement that the jury believe appellant's testimony that he did not intend to shoot anyone, but intended merely to scare his imaginary assailants. The only requirement is that there be sufficient evidence to justify the jury's verdict which imports a finding of specific intent to kill. Commonwealth v. Logan, supra, 191.
A careful review of the record discloses that all the ingredients necessary to sustain a conviction of murder in the first degree have been proven to exist. The unprovoked nature of the assault, the deadly aim and the number of shots fired indicate not only a malicious state of mind but a well-formed intention to take human life. Under the circumstances, imposition of the death penalty would have been fully warranted.
Judgment and sentence affirmed.