Eckert, Plaintiff in error, vs. The State, Defendant in error.

*March 14—April 1, 1902.*

*Insanity: Instructions to jury: Homicide: Degree: Evidence.*

1. Upon the trial of a special issue of insanity, it was not error to refuse an instruction to the effect that the verdict should be not guilty if the killing was the offspring or product of mental disease in the defendant, and to make predominant the idea that if the defendant, at the time of the homicide, had sufficient mind to know right from wrong and to understand the nature and quality of the act he was committing, then he was sane, in law.

2. Defendant's testimony that during a violent quarrel with his wife, after threatening to kill him, she assaulted him with a razor, whereupon he seized a revolver in the drawer of a washstand and shot her twice, is *held* to sustain a conviction of murder in the second degree; and although the theory of the prosecution was that he deliberately shot his wife while she was asleep, defendant cannot object to a verdict based upon the supposed truthfulness of his own testimony.

Error to review a judgment of the circuit court for Waukesha county: James J. Dick, Circuit Judge. *Affirmed.*

For the plaintiff in error the cause was submitted on the brief of *C. E. Armin.* He contended, *inter alia*, that the definition of legal insanity which has been adopted in this state is so far outgrown and so antiquated, in view of the progress in modern psychiatry, that another and more scientific definition should be laid down, and that it was error in the court, upon the trial of this case, to refuse to give the charge requested by the defendant, that "if the defendant killed his wife in a manner that would be criminal and unlawful if the defendant were sane, the verdict should be, 'Not guilty, by reason of insanity', if the killing was the offspring or product of mental disease in the defendant." *State v. Jones,* 9 Am. Rep. 242, 50 N. H. 369; 4 Am. Law Review, 236; 15 id.

726; Ray's Med. Jur. of Ins. sec. 44; Maudsley, Resp. in Ment. Dis. 104; 2 Hamilton, System of Legal Medicine, 177; Winslow, Obscure Diseases of the Brain, etc. 132; Spitzka, Manual of Insanity, 23.

For the defendant in error there was a brief by the *Attorney General,* and oral argument by *R. F. Hamilton,* second assistant attorney general.

CASSODAY, C. J. The plaintiff in error was convicted of murder in the second degree for having, about 5 o'clock on the morning of August 26, 1899, killed his wife by shooting her with a revolver. There were at the time two other persons occupying rooms in the upper part of the house,—an uncle of the deceased, by the name of Minor, and a boarder by the name of Young,—but neither of them witnessed the killing, both being asleep at the time; but it was admitted by *Eckert,* who soon thereafter went, in company with Young, and gave himself up to the sheriff. *Eckert* was a carpenter by trade, forty-four years of age, and had been married and lived with the woman he killed for twenty years, and had for some time previous to the killing suspected improper relations between his wife and one Turner. His counsel states the circumstances of the killing, to the effect that the day previous she went to the county fair with her uncle, Mr. Minor, who was visiting her; that about 5 o'clock in the afternoon Minor returned without her; that soon after *Eckert* saw his wife, in company with Turner, going from the fair grounds toward the business part of the city; and he immediately pursued them, and the three met in front of a saloon, where they had a stormy interview, and he then told Turner he was digging his own grave. The deceased insisted upon Turner going home with her, and he did; *Eckert* walking ahead and shedding tears. On reaching home, *Eckert* became quite violent in his language,—his wife taking part in the controversy,—until

Turner, accompanied by Minor, left the house and went down town. Mrs. Eckert then got supper, but *Mr. Eckert* refused to eat, and had taken no nourishment during the day. After supper he and his wife appeared to be reconciled, and went riding together, and while doing so met Turner; and his wife then insisted on *Eckert* making an apology to Turner for what he had said to him, but *Eckert* refused to do so. They returned home about 10 o'clock in the evening, and after *Eckert* had put out the horse he went into the house and found his wife, with her wraps on, engaged in writing. After Minor and Young had gone to bed, according to *Eckert's* testimony, which is uncontradicted, his wife finished her letter and directed it; and then, against his objection, she went out and down the street, as she said, to put the letter in the mail box, and did not return until 2 o'clock in the morning. He did not go to bed, and on her return they had a stormy interview, during which she threatened to cut his throat with a razor which she had secreted. When she went to bed she put the razor under her pillow, and he remained on the lounge, and from time to time protested against her conduct with Turner. Between 4 and 5 o'clock in the morning he went into the room, and up to the side of the bed, to make a last appeal to his wife to desist from going longer with Turner. She rebuked him with vile epithets, telling him that she loved Turner. He then threatened to commence proceedings for a divorce. She replied that he would never live to get a divorce; that she would cut his heart out,—and drew out the razor, whereupon he seized a revolver in the drawer of the washstand near the bed, and shot her twice,—first immediately back of the left ear,—leaving slight powder marks around the wound; and the second shot took effect in the cheek, and apparently had been fired from directly over her, and was badly powder-marked. The end of her thumb on her left hand had been shot away. When the two persons sleep-

ing upstairs got up, *Eckert* told them that he had shot his wife.

At the time of and before the commencement of the trial a special plea of insanity was interposed, with the plea of not guilty. The case appears to have been tried with care and deliberation upon both issues. The charge of the court on the issue of insanity covers a half dozen typewritten pages, and the request to charge on that issue covers nearly as many more pages. The gist of such requests is stated in the brief of counsel for the accused in these words:

"If the defendant killed his wife in a manner that would be criminal and unlawful if the defendant were sane, the verdict should be, 'Not guilty, by reason of insanity,' if the killing was the offspring or product of mental disease in the defendant."

In commenting upon the refusal of the court to give the instructions so requested, the same counsel aptly states:

"While the court injected into its charge nearly all of the requests of the defendant, they were so interwoven with the one dominating idea, viz., that if the defendant at the time of the homicide had sufficient mind to know right from wrong, and to understand the nature and quality of the act he was committing, that then he was sane in the law."

The charge of the court was fully justified, and in fact closely followed what was said by Mr. Justice Dodge, and held by this court, in the recent case of *Butler v. State,* 102 Wis. 364, 366, 367, 78 N. W. 590. It is in harmony with the rule stated by Chief Justice Shaw more than half a century ago, and which has been incorporated into the text-books and become elementary, as follows:

"A man is not to be excused from responsibility if he has capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he is then doing,—a knowledge and consciousness that the act he is doing is wrong and criminal and will subject him to punishment.

In order to be responsible, he must have sufficient power of memory to recollect the relation in which he stands to others, and in which others stand to him; that the act he is doing is contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty. On the contrary, although he may be laboring under partial insanity, if he still understands the nature and character of his act and its consequences; if he has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know that, if he does the act, he will do wrong and receive punishment,—such partial insanity is not sufficient to exempt him from responsibility for criminal acts." *Comm. v. Rogers,* 7 Met. 501, 502; 2 Greenl. Ev. (15th ed.), § 372.

We perceive no error in charging or refusing to charge the jury on the issue of insanity. The finding of the jury upon that issue is sustained by the evidence.

Counsel contends that the evidence is insufficient to convict the accused of murder in the second degree. The statute declares that "such killing, when perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, without any premeditated design to effect the death of the person killed or of any human being, shall be murder in the second degree." Sec. 4339, Stats. 1898. *Eckert's* version of what occurred at the time of the shooting, as stated above, is sufficient to support such conviction. In fact, counsel's contention seems to be based upon the theory of the prosecuting attorney on the trial, to the effect that *Eckert* deliberately shot his wife when she was sound asleep. But *Eckert* is in no position to object to a verdict based upon the supposed truthfulness of his own testimony as to his being threatened and assaulted by his wife with a razor, as mentioned in the above statement of facts. Such evidence brings the case within the recent rulings of this court. *Odette v. State,* 90 Wis. 258, 62 N. W. 1054; *Flynn v. State,* 97 Wis. 44, 72 N. W. 373; *Sullivan v. State,*

100 Wis. 283, 75 N. W. 956. We find no reversible error in the record.

*By the Court.*—The judgment of the circuit court is affirmed.