Commonwealth *v.* Schroeder, Appellant.

Argued October 8, 1930. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Percy Allen Rose,* with him *Benjamin Jarrett, Thomas W. Dickey* and *K. H. Powell,* for appellant.—An effort in support of introducing evidence of defendant's environment was made by asking her the question: "In what kind of environment were you raised as to associations and surroundings?" The objection thereto of immateriality was made and was sustained by the court. This was error: Com. v. Buccueri, 153 Pa. 553; Taylor v. Com., 109 Pa. 262; Com. v. Gearhardt, 205 Pa. 387; First Nat. Bank v. Wirebach, 106 Pa. 37.

It was error to permit medical experts for the Commonwealth to first testify defendant was sane and then to state that she was an habitual criminal.

The defense of irresistible impulse was on the ground of partial or a phase of insanity recognized by our courts from Com. v. Mosler, 4 Pa. 264, to Com. v. Cavalier, 284 Pa. 311.

If a fellow officer of deceased fired the fatal shot defendant was entitled to an acquittal.

Just what errors are to be considered basis or fundamental must necessarily depend on the facts of each case: White v. Moore, 288 Pa. 411; Myers v. Com., 83 Pa. 143.

Defense of irresistible impulse was available to defendant even if the homicide was wilful, deliberate and premeditated.

Medical experts are not permitted to pass upon the whole case and to base their conclusions as to sanity of defendant on reconciliations of contradictions in evidence: Yardley v. Cuthbertson, 108 Pa. 395; McMinis v. Transit Co., 288 Pa. 377; McDyer v. Rys., 227 Pa. 641.

*Charles J. Margiotti,* with him *John S. Powers,* District Attorney, *Sebastian C. Pugliese* and *Edward Friedman,* for appellee.—Defense of irresistible impulse to steal, rob and flee, was not available to defendant: Com. v. Cavalier, 284 Pa. 311; Com. v. Wireback, 190 Pa. 138; Coyle v. Com., 100 Pa. 573; Com. v. Calhoun, 238 Pa. 474.

Secondary evidence is inadmissible to prove partial or special insanity independent of the opinions of properly qualified lay or expert witnesses: Com. v. Snyder, 224 Pa. 526; Com. v. Cleary, 148 Pa. 26; Com. v. Dale, 264 Pa. 362; Com. v. Cavalier, 284 Pa. 318.

When evidence offered is relevant in part only, the court is not bound to separate the good from the bad, but may reject it as a whole: Hunter v. Bremer, 256

Pa. 257; Justice v. Watkins, 276 Pa. 138; Coyle v. Com., 104 Pa. 117.

OPINION BY MR. JUSTICE SCHAFFER, November 24, 1930:

Irene Schroeder stands convicted of murder of the first degree; death has been fixed as her punishment. Her appeal brings the entire record before us for review. We have painstakingly examined it in view of the various questions which she raises for our consideration. To all of them we have given careful thought, having in mind the consequences to the condemned, and our duty as fixed by the Act of February 15, 1870, P. L. 15, to ascertain whether in the proofs submitted against her there appear the elements of murder of the first degree, warranting the punishment meted out, and also whether any reversible error occurred in the trial. Our conclusion is that appellant was fairly and impartially tried, that all the elements of first degree murder were shown to be present and that no reversible error is manifest.

To appreciate the situation surrounding the crime and to envisage clearly the main legal question involved, the incidents leading up to the homicide, those surrounding its actual commission and many of the ones following it must be stated with some fullness. The circumstances are so dramatic and unusual that they might well tax credulity if not established by unimpeached testimony, including that of the woman herself.

She was twenty-one years old when the murder was committed, was married and had one child about four years old. She had left her husband and was living meretriciously with Glenn Dague, who has also been convicted of the crime and is under sentence of death. For some months before December 27, 1929, when the killing occurred, she and Dague had carried on a series of robberies. They operated from Wheeling, West Virginia, and preyed upon communities in a wide circuit

therefrom. Their crimes were carefully planned and skillfully and daringly executed.

On the morning after Christmas, 1929, appellant, Dague, and appellant's brother, Tom Crawford, left Wheeling in a stolen Chevrolet automobile equipped with license plates from another stolen car. They took her little son with them; he was evidently carried to aid escape. Each of the adults, was armed with a loaded revolver. Appellant was familiar with the use of firearms. In pursuance of a plan they had made, they drove to Butler, in this State, reaching a hotel there between ten and eleven o'clock at night, where they registered as the Albert Courtright family of Dillonvale, Ohio. Leaving the hotel the following morning about eleven o'clock, they drove to the vicinity of a grocery store in Butler. Dague alighted from the automobile, entered the store, made a small purchase and left. Some little time later defendant appeared in the store and asked the manager, who was alone, for some apples. In order to get them he had to come from behind the counter. As he was stooping to get the apples, Dague entered the store and confronted him with a drawn revolver. Irene Schroeder turned from the counter and did likewise. At the point of their pistols they marched him into a rear room, bound him with heavy twine prepared for the purpose, which Dague took from his pocket, gagged and robbed him. While this was going on a customer entered the store. Immediately appellant went to him and at the point of her revolver compelled him to enter the rear room, where he too was bound and gagged. While in the store defendant stole $69 from the cash register. On their way out they met another customer to whom she spoke, saying "The manager will be out in a minute." While Dague and the woman were engaged in robbing the manager, Tom Crawford was in the store on guard. During the time they were all in the store, the child was concealed in the automobile under the dashboard. Entering the car, the three felons

drove rapidly in the direction of New Castle. The store manager shortly after their departure attracted the attention of a person entering the store. The police of Butler were notified of the robbery and information of it was telephoned to all the near-by towns, among those receiving the word being Corporal Brady Paul, who was in charge of the State Highway Patrol detail in New Castle. Accompanied by private Ernest C. Moore, he proceded by motorcycle on the Butler-New Castle Road to intercept the robbers. They stopped all cars proceeding toward New Castle and in doing so halted the one in which the defendant, Dague, Crawford and the child were riding. Dague, the woman and the child were in the front seat, Crawford in the rear. Dague, followed by appellant, got out of the car; they drew their revolvers on Paul as they alighted and he was forced back to the rear of the automobile. Moore, the other officer, was covered by Dague and Paul by the woman. Moore moved toward the front of the car and as he was doing so, Crawford from the rear of the car shot at him, hitting him in the nose. Crawford continued to fire at him and Dague likewise. One of the shots struck Moore on the head and he fell unconscious in front of the car.

While Moore was being fired at by Dague and Crawford, defendant, was giving attention to Paul, who had put up his hand as she directed. She shot at him; his body swayed and his left arm twitched. He backed away from her and she shot at him again and he fell over. A physician who attended him after the shooting testified that such a wound as he received in the abdomen would knock him down. When he fell she turned and ran to the running board of the car facing Moore and shot twice at him. Paul arose, drew his revolver and holding his abdomen ran toward a telephone pole alongside the road. Dague pushed the unconscious form of Moore away from the front of the automobile, then ran to the rear of the car, fired a shot

at Paul and hastily entered the automobile and started it in the direction of New Castle. As the car sped down the road, Paul emptied his revolver at it, striking it several times.

Paul and Moore were immediately taken to the hospital in New Castle, where Paul died shortly after arrival, as the result of the gun-shot wound in the abdomen. The bullet causing his death was of 38 calibre. He also had a gunshot wound in his right leg and one in his right arm. The fatal bullet and the one taken from his arm were shown to have been fired from the same weapon, a 38 calibre special Spanish revolver, which the testimony indicates was the kind of revolver used by defendant. Moore recovered from his wounds.

When the fleeing felons reached New Castle, they passed R. C. Horton, who was driving a Chrysler roadster accompanied by Elsie Hickum. Dague pulled his car up alongside the Chrysler, and directed Horton to stop. Both cars halted and Dague got out and at revolver point compelled Horton to alight and surrender his motor. As Horton left his car he was met by defendant, gun in hand. She ordered him to the curb and took from him his wallet and license card. The articles in the Chevrolet car were transferred to the Chrysler one, and in it, the fleeing party proceeded to Wheeling, stealing a set of license plates from another car on the way, which they substituted for those on the Chrysler. Arrived at Wheeling, they went to a garage in which they had stolen cars stored, left the Chrysler car, took out one of another make, placing on it the license plates they had purloined. Crawford left them in Wheeling where he disappeared from view and has not yet been apprehended. The child was taken to the home of his grandfather in a near-by town and left there and Dague and the woman drove to Parkersburg, West Virginia, where they remained in hiding in a room for several days. The room had been stocked with food beforehand. They left Parkersburg at night in another

automobile which they had stolen previously and stored in a garage there. Defendant wore boy's clothing to escape detection. They proceeded West, robbing stores in the daytime and gasoline stations at night. Descriptions of them had been telegraphed country wide and on January 4th, as they were passing through St. Louis, they engaged in a gun battle with one of its policemen, who endeavored to apprehend them, and stole from him a revolver which was found in their possession when they were finally captured. Other police officers in St. Louis endeavored to stop them as they drove through its streets, but they eluded capture. Pursuing their way westward through Oklahoma and Texas, they picked up an ex-convict named Wells, who remained with them until their arrest. At Florence, Arizona, Dague and Wells got out of the automobile and the woman alone drove up to a gasoline station, where she was accosted by Sheriff Chapman, who demanded her license cards. At this juncture, Dague and Wells approached, the former drew his revolver and ordered the sheriff into the car. With the sheriff as their prisoner, they drove on through Arizona. As they passed through Chandler, they were hailed by Sheriff Butterfield and Sheriff Lee Wright, who had received word of the kidnapping of Sheriff Chapman, and another revolver battle took place in which Chapman was wounded, but escaped from the car. Sheriff Wright died of wounds which he received in the encounter. The three fugitives escaped, traveled all night and about six o'clock in the morning abandoned their automobile at the edge of an Indian reservation and continued on foot for several miles into the Oestrella Mountains, where they were captured by a sheriff's posse after a number of shots had been exchanged. Among the things found in their possession was the revolver which they had taken from Moore.

This recital of the facts we have deemed necessary because of the main defense interposed in appellant's

behalf, which was that she was the victim of an uncontrollable impulse to rob, steal and flee. Even if such a defense could avail, her acts negative her contention. They show that what she did before, at the time of, and subsequent to the killing of Brady Paul was not impulsively done, but planned and designed. She and Dague were engaged in systematized robbery. The testimony which she gave about the various robberies indicates that she was self-possessed, unemotional and resourceful. They were carried on for what was realized from them; in certain instances she kept a record of the cash she took. The Butler robbery bears no indication whatever of an impulsively performed act; quite the contrary, it shows a crime prepared for and cooly executed. Every habitual criminal might excuse his wrongdoing on the ground that his impulses moved him to break the law. It may be that unrestrained impulses operate in many crimes, but society for its own protection cannot recognize such a state of mind as excusing the wrongdoer. Moreover, this woman is charged, not with robbing nor stealing, but with murder. Even if she did have the irresistible impulse to rob, steal and flee, it is not in any manner apparent how this impulse could be set up as an excuse for the graver crime. The defendant really got the full benefit of this defense however, as the trial judge in his charge submitted to the jury the question of whether she was controlled by an irresistible impulse and affirmed points, presented by her, covering such defense. This was more than she was entitled to. Speaking on the subject of irresistible impulse as a defense to crime, in Com. v. Cavalier, 284 Pa. 311, 320, where error was assigned to the refusal of the court to affirm a point recognizing it, we said: "Complaint is made because the court did not affirm this point. To have done so would have been to have overturned the law on the subject of the responsibility for crime as it has existed in this Commonwealth at least from Com. v. Mosler, 4 Pa. 264 (1846)

down to the present day." The court should have told the jury that the defense of irresistible impulse is one which our law does not recognize.

Our conclusion in this respect disposes of a number of the questions raised by appellant in her assignments of error, the first, that the court refused the testimony of Sarah J. Muldoon, whose evidence was offered for the purpose of laying the foundation for such a defense, and the complaint as to the disturbance of order of proof in advancing it by the court's ruling, covered by the second assignment, as also the third and fourth assignments, covering the exclusion of the testimony of the defendant herself as to certain incidents in her life, to base such a defense upon. Later in the trial, the Commonwealth withdrew its objection to much of this testimony, so in point of fact she ultimately got substantially her whole life picture, as far as she cared to detail it, before the jury.

Our view on the main proposition, the defense of irresistible impulse, also disposes of the seventh assignment. The trial judge was correct in charging "She [the defendant] does not seek to be acquitted by reason of insanity, and there is no evidence in this case that would warrant a verdict of not guilty on grounds of insanity." Our reading of the record verifies the accuracy of this statement. It bars any contention that the court was in error in stating to the jury "She advances this defense [of irresistible impulse] to the Commonwealth's contention that the killing took place in the perpetration of a robbery, and she asks you not to convict her of murder of the first degree, because the killing occurred in the perpetration of a robbery, if you find that she did not fire the fatal shot. This defense amounts to nothing against the Commonwealth's second contention that the killing of Brady Paul was wilful, deliberate and premeditated, and it should not be considered by you in determining the truth of this contention. So that, regardless of your determination

of the question of irresistible impulse, there remains the Commonwealth's contention, and the evidence supporting it, that the killing of Brady Paul was by this defendant and was wilful, deliberate and premeditated."

It is contended under the fifth assignment that it was error to permit medical experts for the Commonwealth to testify first that defendant was sane and then to state that she was an habitual criminal. The inquiry was directed to the state of her mind, and, in accounting for her actions, which were not those of a law abiding citizen, the physician called was characterizing her as not an insane person, but as one habitutated to crime, just as he might have said under certain circumstances that she was a drunkard or a drug addict or a pervert. Her defense being as it was, he was warranted in classifying her. In badging her as he did, he really adopted her own designation of herself, because in her testimony she detailed facts which showed her to be an habitual criminal. The testimony objected to was offered in rebuttal and as explanatory of the defendant's own evidence. She had said in answer to the question why she stole that she did so "just to get a thrill out of it." In principle, we recognized the propriety of testimony such as that complained against in Com. v. Buccieri, 153 Pa. 535, and Coyle v. Com., 104 Pa. 117. Furthermore, it was admissible to give the jury light on the matter of punishment which was a problem they had to solve. They had a right to know what kind of person she really was: Com. v. Parker, 294 Pa. 144; Com. v. Mellor, 294 Pa. 339.

Under the sixth assignment, it is argued that the court was wrong in charging that certain evidence of credibility of one of defendant's witnesses was substantive evidence of defendant's guilt. Apparently the court did inadvertently treat the evidence as substantive proof. We are convinced that this instruction did defendant no harm and did not bring about her conviction. Part of appellant's defense was that the bullet

which killed Paul was not fired by her, but by Moore, the other officer. Passing the question whether even if it was she would be any the less guilty, the evidence satisfies us, as it satisfied the jury, that the fatal shot was fired by her. She admits that she shot at him more than once at close range. There were seven eye witnesses to the shooting. All of them testified that the first shot was fired at Paul by the defendant, causing his arm to twitch, and that she followed him twelve or fifteen feet further, backing him down the road, and fired another shot at him, and immediately therafter he fell to the ground. She alleges she was using a 32 calibre revolver. The deadly bullet was from a 38. In her statement that she was using a 32, she was corroborated by Dague. Sheriff Wright, in contradiction of Dague, said that the latter told him that he had the 32 and the defendant the 38. In this connection, the trial judge said to the jury: "You also have the testimony of the witnesses who tell you of admissions made to them by the defendant in Arizona with reference to her having a 38, Sheriff Wright telling you that Dague told him he had a 32 and the defendant a 38." While it would have been a more accurate statement if the judge had explained to the jury that Sheriff Wright's testimony was only to be considered as impeaching the statement of Dague, the failure to so state is not a matter of sufficient gravity to set aside the verdict. That the defendant had a 38 calibre revolver was shown by numerous witnesses and did not rest on the testimony as to what Dague declared. "The defendant in a homicide case has no standing in an appellate court to complain of an erroneous instruction unless the error contributed to the result reached by the jury": Com. v. Winter, 289 Pa. 284; Com. v. Divomte, 262 Pa. 504.

The tenth assignment challenges the testimony of medical experts called by the Commonwealth to show that the defendant was not insane and it is argued that they were permitted to pass on the whole case and to

base their conclusions of her sanity on reconciliations of contradictions in the evidence. Our reading of the testimony of these witnesses shows that they did not come to their opinion that appellant was sane by a reconciliation of conflicting evidence given on the trial, but from a physical and mental examination of defendant before the trial, by observing her during the full course of it and upon her own testimony; their evidence was, therefore, fully competent: Com. v. Gibson, 275 Pa. 338; Com. v. Buccieri, 153 Pa. 535; Com. v. Coyle, 104 Pa. 117; Underhill's Criminal Evidence, 3d ed., section 267, page 380; Ibid., section 188, page 264.

We have reviewed all of the contentions made by appellant; none of them can be sustained. The assignments of error are all overruled, the judgment is affirmed and the record remitted to the court below for the purpose of execution.