Commonwealth *v.* Woodhouse, Appellant.

Argued April 21, 1959; reargued May 3, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

244

*Michael von Moschzisker,* with him *Paul Fetterolf,* for appellant.

*R. Lee Ziegler,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, September 26, 1960:

The defendant, Samuel Lawrence Woodhouse, Jr., shot and killed his sixteen year old adopted daughter, Elizabeth Love Woodhouse, who had suffered from Von Recklinghausen's disease from an early age. He was indicted and tried for her murder. The jury adjudged him guilty of murder in the first degree and fixed the punishment at life imprisonment. From the conviction, he appeals.

The defendant was born October 16, 1904, and became engaged in the general practice of medicine about the year 1932. On August 6, 1953, while his wife and mother were away from his home for the day, he went to the daughter's bedroom on the third floor and found her sleeping in bed. Having assured himself that she was asleep, he went downstairs to his drug room on the first floor, took four shells from a box of twenty-twos, returned to the third floor and inserted the four shells in the clip of a bolt action .22 rifle. He aimed the gun at the back of his sleeping daughter's head. The shot misfired. He went to the second floor to secure something to aid in removing the misfired cartridge. He reloaded the rifle, returned to his daughter's bedroom, and fired one shot into the back of her head. He placed her on the floor and folded her arms over her chest. He wiped the blood from the floor, replaced the two remaining shells in the box, and threw the discharged shell and the one that misfired into a creek located to the rear of the property.

Then he treated two patients in the office of his home, one for poison ivy, the other for a puncture wound. He paid a young man for cutting the lawn. Sometime later, he checked his daughter's condition and, finding her still alive and breathing, injected two doses of 5 cc of methadone into her body to hasten death and alleviate suffering. He also injected a total of 25 cc of the same drug into his own body, intending to commit suicide. When his wife and mother returned home late in the afternoon, they found Betsy dead on the floor of her bedroom and the defendant draped over a swivel chair in his office. A local doctor was called, who administered first aid to the defendant and arranged his transfer, by ambulance, to a hospital. The State Police were summoned. At the hospital, defendant's attorney advised him against making any statement to the police.

On August 12th, the defendant was discharged from the hospital; and, with his attorney present at all times, the investigating officers were given their first opportunity to question him. He was taken to his home and he re-enacted the events of August 6th as, he said, they happened. His statements were stenographically recorded. Among other things, he said that he had been having trouble with his daughter for sometime as far as obedience was concerned. He also stated that "the plans to take Betsy's life *had been in my mind for a year or more*[1] and when my mother went with my wife, I realized here was my opportunity."

On February 18, 1954, upon petition of defendant's counsel, the court appointed a commission (under the provisions of the Mental Health Act of July 11, 1923, as amended, 50 PS §1224), to inquire into the defendant's mental condition. After hearings, the commis-

---

[1] Emphasis supplied throughout.

sion concluded that the defendant was mentally ill and recommended that he be institutionalized. On February 25, 1954, by court order, he was committed to the Farview State Hospital for the criminal insane. On September 29, 1955, Dr. John P. Shovlin, superintendent of this institution asked for the defendant's discharge therefrom stating that "he had sufficiently recovered . . . to no longer need custodial care and remedial treatment." By agreement of defendant's counsel and the district attorney, the defendant's transfer to the county jail was deferred. On December 29, 1955, a supplemental petition was presented to the court as a result of which the defendant was ordered transferred to the Harrisburg State Hospital. One year and three months later, the superintendent of this hospital petitioned for his release on the ground that he had fully recovered. The trial began May 6, 1957.

The defendant did not take the stand on his own behalf at the trial. The only defense offered was insanity. His wife testified that the defendant appeared tired and worried about himself for several months before the day involved; that his daughter's disease gave him great concern and that she presented a personality problem which added to his worries; that he frequently indicated an intention to commit suicide; and, that he imbibed intoxicants freely. Other lay witnesses called by the defense testified that for at least a year before the shooting noticeable changes were apparent in the defendant, manifesting signs of unhappiness, irritability, moroseness, lack of memory and a worried attitude about his own health, that of his daughter, and her anti-social attitude.

The defense also introduced the testimony of three members of the medical profession, who for years had specialized in the science and practice of psychiatry.

One of these experts first examined the defendant a little more than three months after the tragedy. He testified that, in his opinion, the defendant at the time of the killing and for sometime previous was suffering from a paranoid involutional psychosis or insanity, and that the defendant acted, at the time involved, under the delusions that he himself was suffering from a hopeless illness and that his daughter was disintegrating both physically and mentally. These delusions, he said, prevented the defendant from *completely* appreciating the quality of his act, when he killed his daughter.

Another such expert, who first examined the defendant two months and ten days after the killing, opined that, at the time in question and for two years previously, the defendant had suffered from a severe psychosis; that the mental illness came with the defendant's change of life and was accompanied by serious delusions. He further expressed the belief that, while the defendant had some awareness that the act of killing was wrong, his insanity was so strong and his judgment so clouded that in his mind the act had to be done regardless.

The third such witness was a medical member of the commission, who examined the defendant approximately six and one-half months following the commission of the crime. His diagnosis that the defendant was suffering from paranoid schizophrenia differed from that of the two experts mentioned above. He stated, however, that in his opinion the defendant had been mentally ill for more than a year before the day he first examined him and that, during this period, he did not appreciate the complete quality of his actions and that, due to delusions from which he suffered, *at times* the defendant failed to know the difference between right and wrong.

All three psychiatrists expressed surprise at the defendant's rapid recovery. During their previous medical examinations, they definitely concluded the prognosis was very poor.

In rebuttal, the Commonwealth called lay witnesses, who had excellent opportunities to talk with and observe the defendant within a short period following the shooting. Two saw him in his office almost immediately after the unfortunate occurrence. They testified that the defendant appeared calm and rational and that there was nothing in his speech, manner or conduct indicating any abnormality or mental disturbance.

The trial judge permitted defense counsel great latitude of proof to sustain the insanity plea. All evidence relevant to the defendant's mental condition was admitted. The psychiatrists were permitted to explain their conclusions in their own terms and in complete freedom. In a very comprehensive charge, the court carefully and fairly defined the issues and explained to the jury the significance of the defense of insanity, its import and ramifications. The trial judge charged in part: "In all crimes where the defense of insanity is set forth, the defendant must show the crime committed was the result of that insanity. In other words, there must be some relation between the insane delusions he may have and the crime he commits. It is not enough to prove, to escape the consequences of his act, that he has some mental infirmity, some disease of the mind. He must go further and show that this disease of the mind is such as to render him incapable of knowing what he was doing, or if he did know what he was doing, the disease of the mind made him unable to judge that what he did was wrong. . . . If the defendant although as alleged, labored under insanity at the time of the shooting, understood the nature of

his act, then and there had knowledge that it was wrong and had mental power sufficient to apply that knowledge to his own case and knew if he did act he would do wrong and receive punishment, he would be responsible."

The jury, as indicated before, rejected the defense and found the defendant criminally responsible.

In support of the request for a new trial, defendant's counsel urge in strong and able fashion that the rule of law given to the jury by the trial judge in this case in regard to the legal test of responsibility, where the defense is insanity, was prejudicial error. It is urged that the rule laid down in *M'Naghten's* case and followed in this trial is unsound, confusing, antiquated and based on notions of mental disorders which are discredited by modern science. It is submitted that Pennsylvania should adopt the broad version of the "Irresistible Impulse" test and that the trial judge erred in not charging the jury in these terms.

Insanity did not become a defense in England until the beginning of the fourteenth century. And, until the seventeenth century, the authorities on the subject were so very general in terms as to be of little concrete value. As a result of great public interest in a trial involving a killing perpetrated by one Daniel M'Naghten, *The Queen v. M'Naghten,* 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843), a debate ensued in the House of Lords, concerning the status of the law in regard to the question of the unsoundness of mind which would excuse the commission of a felony. As a result, five questions were submitted to the fifteen judges of England regarding the existing law of insanity. The answers of the judges gave being to the now long famous "M'Naghten Rule," namely, that "to establish a defense on the ground of insanity, it must be clearly

proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from the disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it that he did not know he was doing what was wrong."[2] The judges, who formulated this rule, did not consider it as an innovation, but rather, as a restatement of the law long in vogue in England as well as in this country.

Shortly thereafter, this rule was adopted as the law in Pennsylvania (*Commonwealth v. Mosler*, 4 Pa. 264 (1846)), and has become firmly established and imbedded in the body of the law of this Commonwealth ever since: *Commonwealth v. Calhoun*, 238 Pa. 474, 86 Atl. 472 (1913); *Commonwealth v. Szachewicz*, 303 Pa. 410, 154 Atl. 483 (1931); *Commonwealth v. Lockard*, 325 Pa. 56, 188 Atl. 755 (1937); *Commonwealth v. Neill*, 362 Pa. 507, 67 A. 2d 276 (1949); *Commonwealth v. Heller*, 369 Pa. 457, 87 A. 2d 287 (1952); *Commonwealth v. Moon*, 383 Pa. 18, 117 A. 2d 96 (1955); *Commonwealth v. Carluccetti*, 369 Pa. 190, 85 A. 2d 391 (1952); *Commonwealth v. Lance*, 381 Pa. 293, 113 A. 2d 290 (1955); *Commonwealth v. Patskin*, 375 Pa. 368, 100 A. 2d 472 (1953); *Commonwealth v. Novak*, 395 Pa. 199, 150 A. 2d 102 (1959).

It has been stated, reiterated and reaffirmed again and again. In *Commonwealth v. Neill* (1949), supra, Mr. Justice HORACE STERN, later Chief Justice, speaking for a unanimous court, said at 514: ". . . insanity within the legal meaning of that term, [is] inability, from disease of the mind, to understand the nature and

---

[2] It is to be noted that in the present case, the trial judge went even further than this rule of law necessitated, when he added, "*. . . and had mental power sufficient to apply that knowledge to his own case. . . .*" (Emphasis ours).

quality of the act and to distinguish between right and wrong with respect to it."

In *Commonwealth v. Heller* (1952), supra, the same Justice again speaking for a unanimous court, said at 461: "All this testimony, [of the same psychiatrist, that defendant was acutely mentally ill at the time of the killing], viewed as an entirety, falls considerably short of an unambiguous opinion that at the time of the homicide defendant did not understand the nature and quality of his act or the difference between right and wrong, which is the legal test for a finding of insanity that would excuse the perpetrator of a homicide from criminal responsibility."

As late as March 16, 1959, Mr. Justice BELL speaking for this Court, said: "Defendant, as other defendants repeatedly have, asks us to reject or change the rule laid down in M'Naghten's Case, 8 Eng. Rep. 718, which was adopted as the law of Pennsylvania in Commonwealth v. Mosler, 4 Pa. 264. These cases established the so-called 'right and wrong' test for insanity, when insanity is raised as a defense by a defendant. Defendant desires us to adopt some undefined psychiatric test. Once more, we refuse to do so. The M'Naghten case rule or 'the right and wrong test' has been repeatedly reaffirmed by this Court. . . .": *Commonwealth v. Novak,* supra, at 210.

If any rule of law is founded on long established precedent in Pennsylvania, this is it.

It is the rule religiously followed in England today. The same is true in Canada. In at least twenty-nine states of the Union, it is still the only test and in some others, while it is still the main test, it is supplemented by the so-called "Irresistible Impulse" test.[3] One

[3] In these jurisdictions, a person is excused from guilt for the commission of crime, if he is incapable of knowing the wrongful-

state, New Hampshire, and the District of Columbia have rejected both of these tests and have adopted what is known as the "Durham Rule."[4] See *Durham v. United States*, 214 F. 2d 862 (D.C. Cir. 1954).

The "right and wrong" test of *M'Naghten's* case has been extensively censured by psychiatrists, law school professors and law review writers for many years. Some judges have also voiced caustic criticism. This criticism reached its peak in this country in the present century as a phase of the rise of psychoanalysis. See, Weihofen, "Mental Disorder As A Criminal Defense"; Roche, "The Criminal Mind"; Biggs, "The Guilty Mind"; Zilboorg, "Mind, Medicine And Man". Some critics advocate the adoption of the "Irresistible Impulse" rule as the guiding test for criminal responsibility in such cases; others favor the application of the Durham rule; *still others argue that all named tests are inadequate* and that, it is thoroughly illogical to entrust the determination of the issue of insanity to laymen; that only experts are qualified to decide this question. Some urge a fresh and completely new approach to the entire problem. It is suggested that we reformulate our laws of penology so that they are no longer focused on punishment as the normal consequence of crime, with other dispositions taking their place as exceptions to the rule; and to allow for three alternate dispositions of the criminal, principally of equal penological rank, viz., punishment, custody and therapy. It is argued that under such a system, the court, after determining the facts of the case, could proceed to a consideration of the way in which the offender should best be dealt

---

ness of the act, or even though he does know that it is wrong, if he is incapable of controlling the impulse to commit it.

[4] An accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect.

with from the point of view of the merits of the case, the requirements of public morality and public safety, and the chances of the offenders' rehabilitation; and could dispose of each case by punishment, by custody or treatment, or by a combination of all of them.

Should the M'Naghten Rule be abolished in Pennsylvania? Our answer is "no" for very compelling reasons. Unquestionably, in a republican form of government as we are privileged to enjoy, order, certainty and stability in the law are essential for the safety and protection of all. Stare Decisis should not be trifled with. If the law knows no fixed principles, chaos and confusion will certainly follow. Despite this, we agree that the law should never be stunted in its growth. Precedent may not be sufficient reason, in itself, to sustain. If some principle is based upon an erroneous premise long since dissipated by accurate, dependable knowledge, no one may justifiably or reasonably argue that the law should not be brought up with the times. If it is clear that the reason for a law no longer exists and modern circumstances and justice require a change, and no vested rights will be violated, a change should be made. But, we are not convinced that this situation presents so definite a picture. Furthermore, a rule so long adhered to should not now be rejected except for solid, cogent and convincing reasons. Certainly, its extensive acceptance and survival for more than a century is an index of its soundness as a practical and efficient, fair and wise instrument to determine the important issue involved.

Admittedly, criticism is lodged loud and long against the unsoundness of the so-called "right and wrong" test, but by the same token, the other suggested tests are not free from strong-pointed persistent attack and have engendered apparently, even among the psychiatric critics of the rule, justifiable doubts and

widespread differences of opinion: Symposium on Psychiatry and The Law, 22 U. Chi. L. Rev. 317-404; Cavanagh, A Psychiatrist Looks at the Durham Decision, 5 Catholic U. L. Rev. 25 et seq.; Moreland, Mental Responsibility and the Criminal Law—A Defense, 45 Ky. L. J. 215 et seq.; Modlin, The Position of the Psychiatrist in the Administration of the Criminal Law, 4 Kan. L. J. 350 et seq.; Hall, Psychiatry and Criminal Responsibility, 65 Yale L. J. 761. Many psychiatrists, who are very harsh critics of "M'Naghten," attack each other's theories even more vehemently.

The Durham Rule has been consistently rejected in most state jurisdictions since it was first adopted in the state of New Hampshire in 1869: *People v. Hubert*, 119 Cal. 216, 51 P. 329 (1897); *State v. Craig*, 52 Wash. 66, 100 P. 167 (1909); *Eckert v. State*, 114 Wis. 160, 89 N.W. 826 (1902); *State v. Lucas*, 30 N. J. 37, 152 A. 2d 50 (1959); *People v. Carpenter*, 11 Ill. 2d 60, 142 N.E. 2d 11 (1957); *Flowers v. State*, 236 Ind. 151, 139 N.E. 2d 185 (1956); *Commonwealth v. Chester*, 150 N.E. 2d 914, Mass. Sup. Jud. Ct. (1958); *Bryant v. State*, 207 Md. 565, 115 A. 2d 502 (1955).

This rule, simply stated, says that an accused is not responsible if his unlawful act is the product of mental disease or mental defect. Many ask, what do the words "product" and "mental defect" mean? "Mental defect" is so broad, indefinite and nebulous as to be almost indefinable. The term "product" obviously connotes some type of causation. One noted psychiatrist suggests a close affinity between mental illness and criminal behavior. Says he: "Mental illness does not cause one to commit a crime nor does mental illness produce a crime. Behavior and mental illness are inseparable—one and the same thing": Roche, Criminality and Mental Illness—Two Faces of the Same

Coin, 22 U. Chi. L. Rev. 320 (1955). If this theory were adopted and followed to a logical conclusion, would it not lead to a wholesale safe delivery of criminal offenders through the guise of pleading mental irresponsibility? Another noted author seems to think so: ". . . Moreover, the average psychiatrist's attitude toward criminal behavior seems to embody, as basic assumption, that *such behavior is prima facie evidence of mental disease.* It can, therefore, be expected that few psychiatrists will hesitate to find the necessary causal connection between the crime and the disease, once they have determined the disease to exist, knowing a crime has been committed": De Grazia, The Distinction of Being Mad, 22 U. Chi. L. Rev. 339-343 (1955). As one court concluded: "*If* it is true that, from a psychiatric viewpoint, *anti-social behavior either evidences or equals mental disease or defect,* then the Durham test comes perilously close to suggesting that proof of the commission of a crime is also *prima facie* evidence of the legal irresponsibility of the accused": *State v. Lucas,* supra.

"What of 'mental disease' or 'defect' as employed in the Durham test? Is, for instance, the diagnostic label 'psychopathy' a mental disease or defect? See Note, 10 Rutgers L. Rev. 425 (1955). *If the question of what is a mental disease or defect is a psychiatric one, then the law has abdicated its function of determining criminal responsibility to the psychiatrist and the jury will have to accept the unopposed psychiatric view of mental disease or defect. The test will differ with the prevailing psychiatric winds of the moment":* State v. Lucas, supra, at 68 (152 A. 2d).

Another author and recognized authority says that the Durham test opens the door wide to *any* psychiatric theory; that it offers nothing specific for the jury to consider and replaces a device used successfully for

years in favor of a poorly worded and vague concept: Cavanagh, A Psychiatrist Looks at the Durham Rule, 5 Catholic U. L. Rev. 25 et seq.[5]

Another noted authority says the Durham Rule is not an improvement over the now existing rule. He says, in effect, that it is at best nebulous, leaving the jury to grope about for the relevant facts upon which to base an intelligent decision. See Hall, supra, 65 Yale L. J. 770, 771.

Another points to the fact that the Durham Rule emphasizes the question of causation and here the jury can do nothing more than speculate: Wechsler, The Criteria of Criminal Responsibility, 22 U. Chi. L. Rev. 367 (1955).

The "Irresistible Impulse" test also has its decriers: See Davidson, Irresistible Impulse and Criminal Responsibility, 1 J. For. Sci. No. 1 Apr. 1956; Hall and Menninger, "Psychiatry and the Law"—A Dual Review, 38 Iowa L. Rev. 687; Hall, Responsibility and Law, Defense of the M'Naghten Rules, 42 A. B. A. J. 917; and, Waedler, Psychiatry and the Problem of Criminal Responsibility, 101 U. of Pa. L. Rev. 378 et seq. They ask, for instance, supposing the power to resist is only impaired, would this prove irresponsibility? All men are subject to strong urges of various descriptions. Would this reduce "Irresistible Impulse" to something that is not psychopathic at all? Others suggest that it is impossible, in any particular case, to say that an impulse was irresistible; all that can be said is that the impulse did not appear

---

[5] This is supported by Dr. Sidney Bolter, a Michigan psychiatrist, who, at the American Psychiatric Association's one hundred and sixteenth annual meeting, was quoted as saying that the Durham Rule "opens the door to the introduction of all kinds of unproven, unwarranted, theoretical assumptions about human behavior": Phila. Evening Bulletin, May 10, 1960, p. 16, col. 1.

to have been successfully resisted. "The difficulty of distinguishing between uncontrolled impulse and the impulse that is not controlled would take too fertile a dialectorial field": Henderson, Psychiatry and The Criminal Law, 4 Psychiatric q. 103; Hamblen Smith, Psychology and The Criminal, 179.

"Whatever advantages this suggestion (supplementing the right and wrong test by a question as to the individual's ability to act upon his insight) may hold from the point of view of our sense of justice, it is unlikely to improve the position of the psychiatrist. The concept of irresistible impulse is well defined only in a central area where certain impulses are irresistible to all people. . . . But when we enter the territory of impulses that are resisted by some and not by others, and we should decide whether an urge that Tom could safely check was unconquerable for Dick, we are on shaky ground. There is no criteria for this decision": Waedler, supra, p. 383. Other psychiatrists say this test is not adequate. They say that *there is no clear-cut agreement as to its exact meaning:* Spirer, The Psychology of Irresistible Impulse, 33 J. Crim. L., C. & P. S. 457. Many disagree with the appellation "Irresistible Impulse" and now prefer to speak in terms of being "incapable of preventing himself from committing the act." Others point out that it fails to provide an adequate basis for judging severe psychoneurotics and others whose criminal acts seem to stem from unconscious motivation. They argue that it absolutely conflicts with a theory that all psychiatrists accept, namely, the integration of the functions. They ask, since a normal personality operates as a unit, how is it possible that an essential phase of it, i.e., volition, can be seriously diseased while, at the same time, intelligence remains normal, as the exponents of the "Irresistible Impulse" rule in most part believe. Pro-

fessor Hall in Psychiatry and Criminal Responsibility says in 65 Yale L. J. at 761, 762 (1956), "The lawyer pondering the attacks of the psychiatrist critics might also consider the meaningful case of 'Irresistible Impulse.' He would discover that only a short time ago that concept was emphatically presented as an example of the 'uniform' opinion of psychiatrists on criminal responsibility; and yet today 'Irresistible Impulse' is rejected by most psychiatrists as unsound! At this point, the inquiring lawyer might well conclude that psychiatric knowledge is far from being indisputable, and that to reach a sound conclusion of his own he must do something more than choose among the experts."

Hall sums it up in this manner: "If one considers the meaning of the legal tests of rationality in relation to criminal responsibility it becomes clear that the assault on the M'Naghten rules implies much more than the presumption that lawyers are amateurs in the field of human psychology. Ultimately, it is an attack on experience and common sense. It assumes that even the most thoughtful layman's experience with his fellow men and his sensitive insight into the functioning of his own personality in elementary acts for which persons are held responsible are wholly fallacious": Hall, 42 A. B. A. J., 917, 919.

The protection of society is our paramount concern. The science of psychology and its facets are concerned primarily with diagnosis and therapeutics, not with moral judgments. Ethics is the basic element in the judgments of the law and should always continue to be. Until some rule, other than "M'Naghten," based on a firm foundation in scientific fact for effective operation in the protection and security of society, is forthcoming, we shall adhere to it. We shall not blindly follow the opinion of psychiatric and medical

experts and substitute for a legal principle which has proven durable and practicable for decades, vague rules that provide no positive standards.

Defendant's counsel contends that the court erred in refusing his fourteenth point for charge.[6] Sufficient is it to say that, assuming for the sake of argument that defense counsel's assumptions of the law are correct (despite *Commonwealth v. Schroeder,* 302 Pa. 1, 152 Atl. 835 (1930); *Commonwealth v. Daverse,* 364 Pa. 623, 73 A. 2d 405 (1950)), there is not a scintilla of evidence of the contemporaneous existence of homicidial insanity or of an habitual tendency which evidenced itself at any other time previous to the killing. The defendant, therefore, did not meet the burden of proof required to come within the test of *Commonwealth v. Mosler,* supra, and *Coyle v. Commonwealth,* 100 Pa. 573.

The rejection of this requested point for charge, therefore, was absolutely correct and proper.

Lastly, complaint is made of the court's instructions as to the weight to be given expert medical opinion. The language was as follows: "The determination of whether the defendant was legally insane on August 6, 1953, depends to a great extent upon the defendant's statements and the observations of his actions immediately before and after the alleged shooting. Therefore, it is important to consider the opportunity each witness had to observe defendant's actions and what interest, if any, the witness may have in the outcome of the case. In addition thereto, you will consider the opinions of the psychiatrists. You must consider their training, qualifications and experience, and the date or dates when they examined the defendant. It must be

---

[6] "If the mind of the defendant was so affected by disease at the time of the act in question that he could not control his actions, he was not responsible and your verdict must be not guilty."

kept in mind that an opinion is only an opinion. It creates no fact. Because of this, opinion evidence is considered of a low grade and not entitled to much weight against positive testimony of actual facts such as statements by the defendant and observations of his actions." This was an accurate statement of the law. The *lay witnesses* called by the Commonwealth in rebuttal testified to *actual facts*. The executive officer of the Boy Scouts and the young lady patient, who saw the defendant on the same morning, right after the murder, had the unusual opportunity of seeing and observing him at a most important hour. Even witnesses called by the defense testified as to the normal conduct of the defendant on the day of the killing. They testified as to what they saw. The conclusions to be drawn therefrom were completely within the province of the jury. The state policemen, to whom the defendant gave a very lengthy statement six or seven days later, after his release from the hospital, testified to what they saw and observed. An analysis of the statement itself, which is undenied, manifests a splendid recollection of the incidents of the killing and the reasons therefor. It demonstrates quite vividly a mind fully conscious of the nature and consequences of his act and the knowledge that it was wrong. All this was positive proof of actual facts. Actual facts, proven by positive evidence, are under the law of Pennsylvania entitled to far more weight than opinion evidence, even that of experts: *Commonwealth v. Lance,* supra; *Commonwealth v. Patskin,* supra; *Commonwealth v. Heller,* supra. Where the logical conclusions to be drawn from the proof of actual facts is at variance with opinion evidence, then the ultimate truth is for the jury.

Concluding, if the jury believed in the correctness of the opinions voiced by the psychiatrists, the defend-

ant would have been acquitted. Their testimony was substantially adequate to excuse the defendant under the rule stated in *M'Naghten's* case. The jury refused credence to these opinions. This was its prerogative. Strong reliance must be placed on the common sense and the feeling for substantial justice possessed and applied by the average jury. The appellate court is not the finder of the truth, nor is it within our province to assess the credibility of the testimony: *Commonwealth v. Logan*, 361 Pa. 186, 191, 63 A. 2d 28 (1949).

Judgment and sentence affirmed.

·Mr. Justice COHEN dissents.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Three estimable, reputable and veteran physicians gave their expert opinion that when the defendant in this case killed his sixteen-year-old adopted daughter, he was mentally irresponsible. The court, in charging the jury, said: "It must be kept in mind that an opinion is only an opinion. It creates no fact. Because of this, opinion evidence is considered of a low grade and not entitled to much weight against positive testimony of actual facts such as statements by the defendant and observations of his actions."

I submit that this instruction was erroneous. The evidence of doctors in a case of this kind is not "low grade." They have studied and they have been trained to analyze mental disorders. They have had many years of experience, they have seen and analyzed hundreds of cases. They are certainly in a far better position to diagnose a mental illness than a casual observer.

How can anyone doubt that the defendant was mentally ill when he brought death to a person who had done him no harm and from whose death he could ex-

pect no gain of any kind? How can anyone doubt that the defendant was insane when he then tried to kill himself?

Reading the first three paragraphs of the Majority Opinion should be enough to convince anyone that the defendant was not in his right mind when he committed the horrible deeds therein related. The only possible explanation for his conduct is that his mind was unhinged at the time. This conclusion was substantiated by three able men, learned, experienced and wise in the ways of the mind.

Dr. Woodhouse had no possible motive to kill someone who was dear to him—a poor, helpless, sick child. The jury had the right to be assisted in the discharge of their awesome duties by listening to doctors who have dedicated their lives to determining the why and the wherefore of the inexplicable. But when the judge told the jury that the testimony of the three physicians was of "low grade," he practically wiped it out of the case and when he did that he deprived the defendant of a fair trial.

The trial judge also erred, in my opinion, when he refused to charge the jury, as requested by defense counsel, as follows: "If the mind of the defendant was so affected by disease at the time of the act in question that he could not control his actions, he was not responsible and your verdict must be not guilty."

What are palsy, epilepsy, convulsions and other kindred maladies but an inability of the mind to control physical actions? Certainly, if one in an epileptic seizure should strike an unoffending person, the striking would not be regarded criminal. If the mind of the defendant was *so* affected by disease at the time of the killing that he had no more control over his actions than an epileptic can control his equilibrium,

how and why should he be criminally responsible for what he does?

The refusal to charge as requested by defense counsel constitutes another reason for a new trial.

And now I am compelled, albeit most reluctantly, to say something about the brief filed by defendant's counsel in this case. The brief is well prepared, the authorities are cited and reviewed, the argumentation is cogently presented. However, the brief is blemished by a statement which has no place in a lawyer's argument, oral or written. After pointing out the high value which should attach to expert opinion, the brief writer says: "The law has never been ass enough to hold a contrary view."

To refer to the law in such rustic language is not worthy of one learned in jurisprudence, veteran in the use of legal terminology, and distinguished by reputation and achievement. We know that the law does not shine in the constellation of man's endeavors as the impeccable star of undeviating perfection. We know that, in fact, it often dims when errors throw it in eclipse. We also are aware of Mr. Bumble's oft-quoted observation on the law* which adds no glory to jurisprudence in general. But Mr. Bumble was speaking suppositionally and it was undoubtedly his indecorous hypothesis which provoked the unseemly utterance contained in defendant's counsel's brief.

However, regardless of what is said about the law in jest or in serious criticism, the granitic and unbudgeable fact remains that the law has but one objective and that is the ascertainment of truth and justice. If, in its zeal to uphold that golden ideal it sometimes stumbles, it should not be ridiculed and characterized in the graceless fashion above noted.

---

* Oliver Twist, ch. 51.

DISSENTING OPINION BY MR. JUSTICE BOK:

I would abolish the M'Naghten Rule.

It is not the Act of any Legislature, it is not the decision of any court, and it is not the concept of an American mind. It was an advisory opinion given by the British Law Lords in 1843 at a time when the life of the Sovereign and her consort had been threatened, and it grew directly from an unsuccessful attempt upon the life of the Prime Minister. It was conceived by disaster, born of excitement, and nourished in fear. It has, however, fastened like a leech upon American jurisprudence.

The Rule is not used in any other field where mental competence is at issue. When a commission in lunacy is had or proceedings are taken against a person for the appointment of a guardian, the point of inquiry is not whether the patient knows right from wrong but whether he is mentally ill or incapable of handling his property and affairs and is likely to become the victim of designing persons. The Rule does not apply even when the issue is whether he is mentally capable of standing trial and making his defense. The concern of The Mental Health Act of June 12, 1951, P. L. 533, 50 PS §1071 et seq., with regard to those *accused* of crime is with mental health, not with right and wrong. Why should the law's purpose be different with those *convicted* of crime?

If our system of criminal law and penology has a purpose, it cannot be other than to protect society. As Sir Matthew Hale said: "That in business capital [which was most of business criminal in his day, since 17th Century England had 350 capital offenses], though my nature prompt me to pity, yet to consider there is also a pity due the country."

This is precisely where the law has failed in dealing with crime and criminals. With our national law

enforcement officials declaring that the recidivist rate for the country is 60%, we cannot argue that the law successfully protects society. Every time a judge calls attention to the current crime wave he is saying that we are failing to cope with it, and the long and painful history of penology shows that merely giving longer sentences increases crime and does not diminish it.

It may not be possible to prevent a man's first crime, but it should be possible to prevent his second. I do not favor psychiatrists in the courtroom, though every defendant has a right to summon them if he pleases. I favor combatting crime by keeping a felon in prison, regardless of his offense, until he has been shown to be criminally harmless and no longer a menace to society. This should be done by a consensus of our best medical, legal, sociological, and lay brains: I do not favor his release by the action of a board of psychiatrists. If he remains a menace, he should be continued in custody indefinitely. Nor should he be kept in custody beyond the time when he is safe to return to the free community. The law recognizes this principle by providing that when the defense of insanity is successful the defendant shall not be released but shall be continued in custody until he has recovered.

While in prison, a man should receive the most intelligent handling to achieve his rehabilitation, whether it be medical, psychiatric, educational, or vocational, as his needs may require. This is exactly what he receives when detained for mental illness.

The majority refuses to move against the Rule because no satisfactory alternative to it has been presented. I believe that none is needed. The Rule is a ready method of qualifying defendants for conviction and imprisonment, but also for their release without regard for their criminal tendencies. To free dangerous people when they should remain locked up is stupid and has the opposite effect of protecting society. The

Rule does this and hence is the keystone of a vengeful rather than a curative system. If we release a man from prison without curing him, it is obvious that we did no more than avenge ourselves upon him when we put him there.

The maximum social protection will occur when the judicial and penological processes are separated, when the courts decide whether or not defined anti-social deeds have been done and the prisons decide when it is safe to allow a prisoner to return to live among us. It would of course remain his Anglo-Saxon right at trial to ask a jury of his peers to decide whether under all of the circumstances, including his mental derangement as and if the jury sees it, it would be just to hold him accountable: this was the law of England at one period before M'Naghten. See *Rex v. Hadfield*, 27 St. Tr. 1281 (1800).

If jurors are, as the Majority unavoidably implies, capable of knowing the difference between right and wrong without being given standards for those terms, they should be equally able, also without given standards, to assess sanity and insanity.

It must not be forgotten that the operative area of the Rule is very narrow. It applies only to the defendant who asserts that he was mad when he committed the crime but has recovered his sanity since. Not many fact-finders are convinced by such an argument. If he asserts insanity at any other time his condition is judged by The Mental Health Act. But such restricted area is not a virtue or a reason for continuing the Rule. It is hard to be mad enough to qualify for its protection, and this makes it the convenient delight of prosecutors. Less obvious is its guarantee of release to technically sane but criminally depraved men at the end of their pat sentences. They should be called "M'Naghten criminals" and they are the most dangerous of the lot.

We must choose between protecting society and punishing prisoners. The progress of penology shows that we cannot effectively do both. Any enforced restraint, followed by treatment benighted or enlightened, feels like punishment to him who suffers it. Punishment is valid only when, as Thomas Aquinas has said, a man accepts it and makes it his own. If he merely endures what is inflicted upon him, it is of little worth.

The courts are under constant criticism for doing nothing about crime. They can do something. They can abolish their own rules, like M'Naghten's, whose failure cries aloud. The doctrine of stare decisis can remain wholesome only if, among the laws it is allowed to shelter, there are included the quick and not the dead. In the Collected Legal Papers of Mr. Justice HOLMES, 1920, page 139, this appears: "An ideal system of law should draw its postures and its legislative justification from science. As it is now, we rely upon tradition or vague sentiment or the fact that we never thought of any other way of doing things as our only warrant for rules which we enforce with as much confidence as if they embodied revealed wisdom."

Hence my dissent.